**David Allen KELLETT**

v.

**Stacy (Trent) Kellett STUART.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Feb. 8, 2006 Session.

March 30, 2006.

Permission to Appeal Denied by Supreme Court Oct. 2, 2006.

Douglas T. Jenkins, Rogersville, Tennessee, for the Appellant David Allen Kellett.

R.B. Baird, III, Rogersville, Tennessee, for the Appellee Stacy (Trent) Kellett Stuart.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

Stacy Kellett Stuart ("Mother") and David Allen Kellett ("Father") were divorced in 2000. The parties agreed in the divorce that Mother would be the primary residential parent for the parties' three daughters, and Father would be the primary residential parent for the parties' son. During the parties' marriage, Mother was hospitalized several times for her bipolar disorder. When Mother was hospitalized after the divorce, Father obtained temporary custody of the three girls and also sought a permanent change in their custody. Following a trial, the Trial Court concluded there was no material change in circumstances sufficient to justify a change in custody. The Trial Court further determined that it was in the best interests of the parties' three daughters for Mother to remain as their primary residential parent. Father appeals, and we affirm.

## Background

Mother and Father were married in April of 1992. The parties have three daughters who are currently ages 8, 9, and 11, and a son who is 13. Mother sued for divorce in 1999. The final divorce judgment was entered in June of 2000 granting both parties a divorce based upon stipulated grounds of inappropriate marital conduct. By agreement of the parties, Mother was designated the primary residential parent of the parties' three daughters, and Father was designated the primary residential parent of the parties' son.

Father filed a petition seeking primary residential custody of the parties' three daughters in November of 2002. Father claimed there had been a material change in circumstances since the initial divorce decree was entered, and that it was in the children's best interests for Father to be designated the primary residential parent. Mother responded to the petition, generally denying the pertinent allegations contained therein.

While Father's petition for custody was pending, Father filed a petition for temporary custody of the parties' three daughters in January of 2004. Father claimed that Mother had moved to North Carolina and no longer had the additional support of her family members who resided in Hawkins County. According to Father, Mother suffers from severe emotional difficulties and had been committed to a hospital for inpatient treatment. Father sought

temporary custody of their daughters at the very least until such time as Mother was released from the hospital. The Trial Court granted Father's petition for temporary custody.

A trial was conducted on Father's petition seeking a permanent change in custody with respect to the parties' three daughters. Father testified that he has remarried, and he and his new wife have a one year old son. Father acknowledged that at the time of the divorce, the parties agreed that Mother would have primary residential custody of the parties' three daughters, with Father having primary residential custody of the parties' son. Father testified that he had some concerns about Mother having custody of the three girls when Mother moved to North Carolina because Mother had no relatives in North Carolina who could assist her with the children. Father stated that when Mother lived in Tennessee, he was able to visit with the children whenever he wanted, but that changed once Mother got "involved with Mr. Stuart" and moved to North Carolina. Father claims Mother began refusing to allow him to exercise visitation and that he eventually had to obtain a court order from a court in North Carolina. Father claims to have offered to let Mother visit the children anytime she wanted to come to Knoxville after he obtained temporary custody of the three girls, but she only visited with them on one occasion. According to Father, the parties' daughters are very frustrated with Mother because she does not keep in contact with them or visit them.

Father testified that he had secured employment in Wyoming and is planning on moving to Wyoming in the very near future. He and the children have been to Wyoming several times and, according to Father, all of the children are excited about the possibility of living there. Father receives assistance for his educational pursuits from the Veteran's Administration. Father receives a monthly check from the Veteran's Administration for a 30% disability for a condition called Dysthymia. Father is not currently receiving any treatment for that disorder which Father described as "completely under control."

On cross-examination, Father initially denied saying anything negative about Mother to the children. Father admitted telling his son that Mother had been hospitalized for bipolar disorder and most of the things that occur to Mother because of that are not her fault. Father stated that Mother had three episodes during their marriage where she was hospitalized because of the bipolar disorder. Father claimed that when this happened, Mother was usually in and out of the hospital for one or two months. For the first two years after the divorce, Father did not have a serious concern about the safety of the children when they were with Mother because Mother was living in Tennessee with her parents who could assist Mother. Father acknowledged that after he obtained temporary custody of the three girls, he told Mother not to call anymore. However, while Father admits that he later was "told" that he should allow the children to talk to Mother, he never stated whether he informed Mother that she could resume calling. In any event, Mother apparently did call a couple of times, and the children told Mother they did not want to talk to her.

The next witness was Mother. She testified about the recreational activities she and her daughters were involved in when Mother was the primary residential parent. The two oldest daughters earned mostly A's and a few B's in school. Mother stated that the youngest daughter was in preschool at that time.

Mother was hospitalized once in the last two years for a little over two weeks. This hospitalization happened while Mother was eight months pregnant and apparently there was some concern over whether Mother could take her medicine safely and how much she could take in light of her pregnancy. Once Mother was discharged from the hospital, a healthcare provider stayed with Mother at her house for several months. Mother stated she has never had any dangerous thoughts towards her children during those times that she needed hospitalization. Mother continues to have some problems from her bipolar disorder, including irresponsible spending, periods of increased energy, and racing thoughts or speech. Mother claimed that she called the children and attempted to visit with them after she was released from the hospital and after Father had obtained temporary custody. Mother maintained that she did not deny Father visitation with the children after she moved to North Carolina. Mother testified that she did not have any problems with the girls wanting to talk with her or be with her until Father obtained temporary custody. After Father obtained temporary custody, there were times when the girls did not want to talk with Mother. On one occasion Mother called to talk to the girls, and one of them told Mother that she did not love her and not to call again, and then said something to the effect that she could not remember the other thing she was supposed to tell Mother.

Mother and her current husband live in a six bedroom house in Asheville, North Carolina. Mother and her husband have a thirteen month old daughter and Mother takes care of the baby by herself when her husband is working. Mother has not had any problems taking care of this child. Mother does not think she will have any problems taking care of her new daughter and her three other daughters at the same time.

Prior to the trial and at the request of the Trial Court, the parties and all four of their children underwent a psychological evaluation. The report is lengthy and we need not reiterate its entire contents, but will highlight certain portions. The oldest child, Michael, stated that he enjoyed living with Father.[1] Michael informed the psychologist that while he still loved Mother, he had prayed about the situation with his mother and he believed God indicated to him that he should neither live with nor have any contact with Mother. Michael also stated that Father told him that Mother did not love him. Father had told him about Mother's hospitalization and related some of the ongoing court activity.

The oldest daughter, Emily, stated she enjoyed living with Father. Emily did not want to live with Mother because, as Father had explained to her, Mother "stole" Emily from him when she was younger. Father also told Emily that Mother had stated she would rather the children be in State custody than with Father.

The middle daughter, Rachel, was quite anxious during the interview. Rachel told the psychologist that she had various chores she was responsible for completing while living with Father and when she was disciplined, she was "whipped" with Father's belt. Rachel stated that she wanted to live with Mother, but Father and his wife told her that she would be "in big trouble" if she actually said that.

The psychologist noted that when Father brought the girls for the interview,

---

1. As noted previously, Father is the primary residential parent for Michael and that arrangement is not at issue in this case.

they were wearing stained clothes, their hair had not been brushed, and they had a "distinct body odor." According to the report:

Several pieces of information were consistent throughout most or all of the interviews. Each of the girls described being disciplined by being whipped with a belt, and described having difficult chores. Each of the girls also stated that their father instructed them to tell Stacy[2] that they no longer wanted to receive phone calls from her. All four of the children separately described their father as having told negative stories about their mother, including stories how Stacy "stole them" from him, stories about what she has said in court, and stories about Stacy "not wanting" or "not loving" the children. It is apparent by the statements made by these children that their father has been involved in creating in the children an unfavorable opinion of their mother, and has interfered at least to some degree with their ability to communicate with her. This suggests that [Father] has exercised poor judgment with regard to the emotional well-being of the children, and that his interest in discrediting Stacy has occasionally taken precedence over what would be best for the children. It is evident that the children have been coached by their father and step-mother regarding what to say during this evaluation, and is therefore likely that the children were coached prior to their court appearance as well.[3]

Although the report detailed some problem areas for both Mother and Father, including Mother's problems associated with her bipolar disorder, the psychologist ultimately concluded that neither parent nor their spouse posed any sort of a threat to the children. While the psychologist did not conclude that either parent was unfit to care for the children, the psychologist did recommend that, regardless of which parent ultimately obtained custody, the children undergo counseling to help them deal with the "very difficult situation in which they find themselves."

At the end of the trial, the Trial Court announced its decision from the bench. In so doing, the Trial Court initially noted that both parents have some health issues that they are required to deal with, and those issues were considered in the decision "as it may relate to the children." The Trial Court stated:

Frankly, I don't see any major change ... in the situation with mother and [the] children that would ... cause this need for change of custody. She had had health problems ongoing for quite a long period of time. Father knew that when he agreed she should have the children, and ... I'm not able to see that there's any new or different problem that arose.... [S]he was hospitalized and that had occurred before. It was not the first time, and ... there's no evidence that I've seen before the Court that the children were in fact in any danger or threat of any harm to them at that time. The children went with the father, and ... the evidence that I have ... was that the children were doing just fine, ah, before this change. ...

[W]hat is really troubling to me about this case is that the three little girls

2. The children referred to Mother as "Stacy" during the interview.

3. At least two of the children testified at a prior hearing as to which parent they wanted to live with, and it was at this hearing that the Trial Court ordered the independent psychological evaluation.

apparently were doing wonderfully, no indication that there was any problem, but when this change took place there is a problem.... [The children are] being asked to decide do you want to live with me, or do you want to live with someone else, and that sort of thing.... They're, I believe, being told things about ... their mother that children should not be told in my opinion. And it's harmful to children to have to deal with things like that ... [and they] begin to view their mother as a bad person....

[T]he bottom line is that I don't really see a strong good reason as to why the children were removed from their mother, or why they should not be with her. And so, I think [that is] in their best interests .... [T]he mother has problems that ... she can't help. It's ah it's an illness that she has to deal with, ... but she has done that for years, and she has ah, done a good job with the children, ah, as far as I can tell they've never been in any danger and have done really well in school and otherwise, good, well disciplined children according to the testimony, not problem children in any way.

Following the trial, the Trial Court entered an Order denying Father's petition seeking to be designated the primary residential parent of the parties' three daughters. Father appeals claiming the Trial Court erred when it found that there was no material change in circumstances and in further finding that it was in the children's best interests for Mother to remain the primary residential parent for the parties' three daughters.

### Discussion

 The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence pre-

ponderates against them. *See* Tenn. R.App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn.2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn.2001).

 Existing custody arrangements are favored since children thrive in stable environments. *Aaby v. Strange*, 924 S.W.2d 623, 627 (Tenn.1996); *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn.Ct. App.1999). A custody decision, once made and implemented, is considered *res judicata* upon the facts in existence or those which were reasonably foreseeable when the initial decision was made. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn.Ct.App. 2001). However, our Supreme Court has held that a trial court may modify an award of child custody "when both a material change of circumstances has occurred and a change of custody is in the child's best interests." *See Kendrick v. Shoemake*, 90 S.W.3d 566, 568 (Tenn.2002). According to the *Kendrick* Court:

As explained in *Blair [v. Badenhope*, 77 S.W.3d 137 (Tenn.2002) ], the "threshold issue" is whether a material change in circumstances has occurred after the initial custody determination. *Id.* at 150. While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the

change "is one that affects the child's well-being in a meaningful way." *Id.* (citations omitted). *Kendrick*, 90 S.W.3d at 570. *See also* Tenn Code Ann. § 36–6–101(a)(2)(B)("If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child....").

The *Kendrick* Court went on to explain that if a material change in circumstances has been proven, "it must then be determined whether the modification is in the child's best interests ... according to the factors enumerated in Tennessee Code Annotated section 36–6–106." *Kendrick*, 90 S.W.3d at 570. It necessarily follows that if no material change in circumstances has been proven, the trial court "is not required to make a best interests determination and must deny the request for a change of custody." *Caudill v. Foley*, 21 S.W.3d 203, 213 (Tenn.Ct.App.1999). If a material change in circumstances has been proven, when undertaking a best interests analysis Tenn.Code Ann. § 36–6–106(a) requires the court to consider, in relevant part, the following:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; ...

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) (A) The reasonable preference of the child if twelve (12) years of age or older.

(B) The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; ...

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn.Code Ann. § 36–6–106(a).

First, we address whether the Trial Court erred when it found that there had been no material change in circumstances sufficient to warrant a change in custody. Father's main argument that there was a material change in circumstance centers around Mother's bipolar disorder. Father claims Mother's most recent hospitalization was a material change in circumstance. Mother was in the hospital a little over two weeks during this hospitalization. However, Father testified that when Mother was hospitalized during their marriage, she was in and out of the hospital for one or two months. Thus, with regard to her most recent hos-

pitalization, Mother actually was in the hospital for a shorter period of time than when she was hospitalized during the parties' marriage. Although Mother needed post-hospitalization care that was rendered at home, it is unclear how much of this care was attributable to the pregnancy and medication issues surrounding that pregnancy. The issue we must decide is whether the facts preponderate against the Trial Court's decision that Mother's most recent hospitalization was not a material change in circumstances, and we conclude that the evidence does not so preponderate.

■■■ Another fact Father points to when claiming there was a material change in circumstance includes Mother's move to North Carolina. Along this line, we note that the Trial Court concluded that the children were thriving while living in North Carolina, and any problems started only after the children began living with Father in Tennessee. Father points to no facts which go against this finding. Father also fails to show how his impending move to Wyoming would not have the similar negative effect that he claims resulted from Mother's move to North Carolina.

■■■ Father next argues that Mother's limited interaction with the children once Father obtained temporary custody also constitutes a material change in circumstances. Assuming for present purposes only that the amount of Mother's interaction with the children could affect whether there was a material change in circumstances, we do not believe Mother's lack of interaction with the children in this case should have such an effect. We reach this conclusion because of the inappropriate actions of Father in attempting to turn the children against Mother. It would be pure

speculation for us to try to determine how much interaction Mother would have had in the absence of Father's unfortunate crusade against Mother. Because any lack of contact was due to Father's conduct and not Mother's, we refuse to hold that the Trial Court erred when it concluded Mother's limited interaction with the children during the relevant time period did not constitute a material change in circumstances.[4]

■■■ Having concluded that the Trial Court did not err when it determined that there had been no material change in circumstances sufficient to warrant a change in custody, the issue of what was in the best interests of the parties' daughters was an issue the Trial Court need not have reached. See Caudill v. Foley, 21 S.W.3d 203, 213 (Tenn.Ct.App.1999). However, since the Trial Court did find that the best interests of the three children at issue was for them to remain in the custody of Mother, we will discuss the propriety of that decision. The factors to be considered in making a best interests analysis are set forth in Tenn.Code Ann. § 36–6–106(a), supra. As in most cases, some of these factors tend to favor one parent over the other. For example, when considering the mental health of the parents, this factor would tend to favor Father even though both parents have emotional disorders and neither parent is a threat to the children. A factor which clearly favors Mother is her ability to facilitate and encourage a good relationship between the children and Father. Father has demonstrated a complete inability, or at least an unwillingness, to encourage such a relationship between the children and Mother. In fact, we can go so far as to say that if Father is awarded custody of their three daughters, based on the evidence as it currently exists, it is

4. Because of Father's egregious conduct in turning the children against Mother, Emily's stated preference for living with Father can be given very little, if any, weight.

unlikely that Mother would ever have a decent relationship with any of the children because of Father's repeated attempts to thwart such a relationship. Even though some factors favor one parent over the other, the key findings of the Trial Court involve its determination that Mother's bipolar disorder poses no threat whatsoever to the children and that they thrived while in her custody and care. The preponderance of the evidence does not weigh against any of these findings. Therefore, even if the Trial Court was required to make a best interests analysis, we conclude the Trial Court did not err when it held that the best interests of the children was for them to remain in the custody and care of Mother.

### Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. Costs on appeal are taxed to the Appellant, David Allen Kellett, and his surety.