# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs to Western Section Court of Appeals March 30, 2007

## WENDY CLARK v. RANDAL LEE ARTHUR

**Direct Appeal from the Chancery Court for Sumner County**
**No. 98D-305     Tom E. Gray, Chancellor**

_____

**No. M2005-01719-COA-R3-CV - Filed on May 4, 2007**

_____

This appeal involves petitions for contempt and to modify a custody order. Both the mother and the father filed petitions seeking to have the initial custody order modified, and both asked that the other parent be held in contempt for failing to comply with the parenting plan. They presented various arguments about why custody should be changed in their favor, but neither alleged that any circumstances had changed since the initial order was entered. The trial court dismissed both petitions after finding that both parties had failed to prove a material change in circumstances to justify a modification of the custody order. The court also dismissed both petitions for contempt. For the following reasons, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Randal L. Arthur, Hendersonville, TN, *pro se*

Wendy Clark, Nashville, TN, *pro se*

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Wendy Clark ("Mother") and Randal Arthur ("Father") have a son, Dillon Clark, who was born on December 21, 1989.[1] Mother and Father married sometime after Dillon was born, but they later divorced. A final decree of divorce was entered by the Chancery Court of Sumner County on August 16, 1999. Mother was granted primary custody of Dillon, and Father was to have visitation on alternating weekends, alternating holidays, after school on Tuesdays, and for six weeks during the summers.

On April 7, 2005, when Dillon was 15 years old, Mother filed a petition for contempt against Father and for modification of the visitation schedule. She alleged that Father was continuously late in returning Dillon from visitation, that Father had failed to provide insurance for Dillon as ordered by the court, and that Father was not adequately supervising Dillon during summer visitation periods. She alleged that Father was living on a sailboat and complained that Dillon did not have access to a telephone while visiting his Father. Mother asked that Father's summer visitation time be reduced to two weeks, that Father be compelled to supervise Dillon during visits, and that Dillon be provided with access to a telephone when staying with Father.

On May 19, 2005, Father filed an answer to the petition stating that Mother had cancelled Father's previous insurance, and Father denied Mother's contention that Dillon was inadequately supervised and did not have telephone access. He admitted staying on the boat but also gave his parents' address as "his residence." He subsequently filed a counter-petition against Mother for contempt and asked that he be granted full custody of Dillon. Father alleged that Mother was interfering with his visitation by refusing to allow Dillon to visit on certain court ordered days and weekends, and that she was impeding Father's phone contact with Dillon. Father further complained that Mother was verbally abusing Father and his family, and that she was physically and emotionally abusing Dillon. Specifically, he alleged that Mother had struck Dillon in the face and head on several occasions, and that she had isolated Dillon and sabotaged his participation in extracurricular activities. Finally, he asked the court "to recognize the child's desire to have his last name changed to Arthur."

The trial court held a hearing on both petitions on June 6, 2005. Mother's boyfriend testified about Father consistently being late in returning Dillon. He also testified that Father talked to Dillon on the phone at least daily, but that he and Mother had problems contacting Dillon when he was with Father. On at least one occasion, Father had left Dillon at his grandmother's house while Father went to work in Florida. Mother came to get Dillon from his grandmother's house, and when Father returned, he came to Mother's house with the police to retrieve Dillon. Mother introduced several inappropriate materials Dillon had printed from the Internet while on Father's computer, including

___

[1] At the time of Dillon's birth, Mother was separated from her former husband but not yet divorced. Consequently, Dillon was given the last name Clark.

explicit lyrics from a rap song and several pornographic pictures. Mother also introduced written communications between her and Father about proposed schedules for summer visitation. It appears that they disputed whether summer holidays that occurred during Father's visitation should count toward his summer visitation time.

Dillon testified that Father lived on a sailboat at a marina, and that he also stayed there when he visited Father. Dillon explained that during summer visitation, Father often worked during the day but their "next door neighbor" from another boat would supervise him. He said that he always had telephone access when he wanted to call Mother, and that when he was at Mother's house, she always told him about messages from Father. He agreed that Mother was often forgetful, but he attributed it to her multiple sclerosis. Dillon testified that he had heard Mother say bad things about Father and his fiancé, and that Mother told him that they were drug users. Dillon also acknowledged that Mother had said Father never desired to have Dillon and Father did not believe Dillon was his child, but Dillon said he did not believe these things. Dillon said that Mother had threatened to take Father's visitation away if Father did not adhere to her proposed schedule for the summer. When asked about being isolated, Dillon only said that he had been grounded before for his grades, but that he was still allowed to have friends over and to visit with Father. He said Mother had asked him about playing sports, but he was not interested. Dillon also explained that Mother had slapped him in the face on one occasion, one to two years before, but that he had not been abused by Mother and he was not afraid of Mother. When asked about his preference, Dillon stated, "I'd like to see what it's like to live with my father."

After hearing all the testimony, the trial judge stated that "What has happened here was certainly not any different than what happened from the time the divorce was filed until this divorce was granted, and that is that the mother and the father have difficulty communicating. They also have difficulty doing business together. And that has continued." The trial court subsequently entered an order dismissing both parents' petitions to modify the custody arrangement and dismissing both petitions for contempt. The court found that neither party had demonstrated a substantial and material change of circumstances to justify a modification of the custody order. Therefore, the parties were ordered to follow the parenting plan included in their divorce decree.

With regard to the contempt charge against Father, the court found that Mother had not proven by a preponderance of the evidence that Father was bringing Dillon back late, and there had been no evidence presented about his failure to provide insurance. The court determined that Mother had established that Father was not adequately supervising Dillon, and Father was ordered to supervise him when using the computer and to provide him with access to a telephone. The court also ordered Father to return Dillon to Mother's house when Father planned to be away from home overnight.

Regarding Father's contempt petition against Mother, the court found that Father had not proven by a preponderance of the evidence that Mother was interfering with his visitation, impeding his telephone calls, abusing or isolating Dillon, or that she was verbally abusing Father and his family. Still, the court orally cautioned Mother against making derogatory comments about Father,

warning her that such action was not allowed by the trial court or by law. The court instructed both parties to allow "a 15 minute tolerance" when the child was being returned, and if the other parent was late then a contempt oath affidavit could be filed and a hearing would be held. Father filed his notice of appeal to this Court on July 13, 2005.

## II. ISSUES PRESENTED

Appellant has timely filed his notice of appeal and presents the following issue, as we perceive it, for our review:

Whether the chancery court erred in dismissing Father's petition to modify the custody arrangement and in dismissing Father's petition for contempt.

For the following reasons, we affirm the decision of the chancery court.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION
### A. Petition to Modify Custody

In child custody cases, appellate courts give great weight to the decision of the trial judge who saw and heard the parties testify. *Rubin v. Kirshner*, 948 S.W.2d 742, 746 (Tenn. Ct. App. 1997) (citing *Bush v. Bush*, 684 S.W.2d 89, 95 (Tenn. Ct. App. 1984); *Riddick v. Riddick*, 497 S.W.2d 740, 742 (Tenn. Ct. App. 1973)). Appellate courts are reluctant to second-guess a trial court's custody decision where so much depends on the trial court's assessment of the witnesses' credibility. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001); *Steen v. Steen*, 61 S.W.3d 324, 328 (Tenn. Ct. App. 2001). "Custody decisions often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings." *Joiner v. Griffith*, No. M2004-02601-COA-R3-CV, slip op. at 3 (Tenn. Ct. App. July 31, 2006) (citing *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997)). Unlike this court, trial courts are in a position to observe the witnesses and to assess their credibility. *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005); *Buckles v. Riggs*, 106 S.W.3d 668, 676 (Tenn. Ct. App. 2003). As

such, trial courts have broad discretion to fashion custody and visitation arrangements that best suit the unique circumstances of each case. *Joiner*, slip op. at 3 (citing *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999)). "It is not the function of appellate courts to tweak a visitation order in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). If no error in the trial court's ruling is evident from the record, the ruling must stand. *Id.* Accordingly, a trial court's decision regarding custody should be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Curtis v. Hill*, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)). We will reverse or modify the trial court's custody decision if we conclude that the decision rests on an error of law, or if the evidence preponderates against the finding that there has not been a material change in the parties' circumstances.

Existing custody arrangements are favored because children thrive in stable environments. *Kellett v. Stuart*, 206 S.W.3d 8, 14 (Tenn. Ct. App. 2006). A custody decision, once made and implemented, is considered *res judicata* upon the facts in existence or those that were reasonably foreseeable when the decision was made. *Curtis*, 215 S.W.3d at 840; *Kellett*, 206 S.W.3d at 14. Still, courts are authorized by statute to alter a custody arrangement as required by intervening circumstances. *Krupp v. Cunningham-Grogan*, No. M2005-01098-COA-R3-CV, slip op. at 7 (Tenn. Ct. App. Aug. 29, 2006). Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 2006) empowers courts to modify a custody decree "as the exigencies of the case may require." However, the party petitioning to change the custody order must prove both that a material change in circumstances has occurred and that a change of custody is in the child's best interest. *Kellett*, 206 S.W.3d at 14. Tenn. Code Ann. § 36-1-101 (a)(2) (Supp. 2006) provides that:

> (B) If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Therefore, the court must engage in a two-step process when considering a petition to modify a custody order. *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003). Given the importance of continuity and stability, the "threshold issue" in cases involving a proposed modification of an existing custody order is whether a material change in circumstances has occurred since the initial custody determination. *Blair v. Badenhope*, 77 S.W.3d 137, 150 (Tenn. 2002). "Only if the court answers this 'threshold' question in the affirmative does it proceed to perform a new comparative fitness analysis and then determine whether a new custody and visitation arrangement is in the child's best interests." *Krupp*, slip op. at 8. If no material change in circumstances has been proven, the trial court "is not required to make a best interests determination and must deny the request for

a change of custody." **Kellett**, 206 S.W.3d at 15 (quoting *Caudill v. Foley*, 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999)); *see also **In re Bridges***, 63 S.W.3d 346, 348 (Tenn. Ct. App. 2001). The issue of whether there has been a material change in circumstances is not directly tied to the substantive question regarding the best custody arrangement under the present circumstances. **Krupp**, slip op. at 8.

Although there are no bright-line rules for determining when a material change in circumstances has occurred, there are several relevant considerations: (1) whether the change occurred after the entry of the order sought to be modified; (2) whether the change was not known or reasonably anticipated when the order was entered; and (3) whether the change is one that affects the child's well-being in a meaningful way. **Cranston**, 106 S.W.3d at 644. Not all changes in the circumstances of the parties and the child warrant a change in custody. **Curtis**, 215 S.W.3d at 840.

In Father's petition seeking full custody of Dillon, he did not allege that any circumstances had changed since the divorce decree was entered. He asked that Mother be found in contempt for interfering with Father's visitation, specifically because she had "refused to let son see father on the court appointed days and weekends" and "continually impeded the phone calls from the father." He also alleged that mother had mentally and physically abused Dillon by striking him on several occasions and isolating him, and that Mother had verbally abused Father and his family. The trial court concluded that Father had failed to prove by a preponderance of the evidence that a material change in circumstances had occurred. Specifically, the trial court found insufficient proof that Mother was interfering with Father's visitation, interfering with his phone calls, isolating or abusing the child, or making derogatory comments to the child. Therefore, the trial court dismissed Father's petition.

As set out in Tenn. Code Ann. § 36-6-101(a)(2)(B), "[a] material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child." Evidence that an existing custody arrangement has proven unworkable in a significant way is sufficient to satisfy the "material change in circumstances" standard. **Boyer v. Heimermann**, No. M2006-01566-COA-R3-CV, slip op. at 7 (Tenn. Ct. App. Mar. 30, 2007). One parent's consistent interference with the other parent's visitation rights can constitute a material change of circumstances. *See **Thrapp v. Thrapp***, No. E2006-00088-COA-R3-CV, slip op. at 15 (Tenn. Ct. App. Mar. 8, 2007) (where a mother limited a father to one overnight visitation in an eight month period). However, a finding that parents are bitter, alienated, or making derogatory comments does not automatically mean that a material change of circumstances has occurred, especially without a showing that their behavior has changed since the original decree. *See **Rubin v. Kirshner***, 948 S.W.2d 742, 745 (Tenn. Ct. App. 1997). A change must be "significant" before it will be considered material. **Boyer**, slip op. at 7.

In this case, the trial court found that Father had failed to prove that Mother was impeding his phone calls. The trial court admonished Mother not to make derogatory comments about Father and emphasized that the issue was extremely important to the court. In addition, the trial court

discussed the summer visitation schedule that was the subject of the parties' disagreement, and the court clarified which holidays would count toward Father's six weeks of visitation and which did not. In doing so, the trial court implicitly recognized that the parents' disagreement was not so significant as to constitute a "material change in circumstances." Neither party contended that the parenting plan had become unworkable; they simply presented arguments about how a change of custody would be in Dillon's best interests. We agree with the trial court's conclusion that the facts presented on these issues do not demonstrate that circumstances have changed materially since the initial custody order. Although neither party was behaving in a manner consistent with Dillon's best interests, no material change in circumstances had occurred warranting modification of the custody order.

With regard to Father's other allegations, the only evidence of physical abuse that was presented was Dillon's testimony that Mother had slapped him on one occasion at least one year prior to his testimony. Regarding his isolation, Dillon testified that Mother had inquired about his interests in sports and activities, and he only stated that he had been grounded because of his grades. The evidence supports the trial court's finding that these allegations, largely unsupported, did not demonstrate a material change in circumstances. Father failed to meet his burden of proof on this issue, and the trial court properly dismissed his petition without reaching the "best interest" analysis.[2]

## B.    Petition for Contempt

Again, the trial court found that the majority of Father's allegations were not supported by the evidence, and where the judge did perceive that a problem was occurring, he clarified each parent's rights and responsibilities. The court dismissed the petition seeking to hold Mother in contempt.

"Determinations regarding contempt lie within the trial court's sound discretion and are final, absent any plain abuse of that discretion." *Hill v. Hill*, 152 S.W.3d 543, 548-49 (Tenn. Ct. App. 2004) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn. 1993); *Sherrod v. Wix*, 849 S.W.2d 780, 786 (Tenn. Ct. App. 1992)). Although the contempt power of the court is an appropriate enforcement tool, *see Kim v. Laumb*, No. M2005-01736-COA-R3-CV, slip op. at 5 (Tenn. Ct. App.

_____

[2] As previously noted, in Father's petition to modify custody, he asked the court to award him full custody of Dillon and "to recognize the child's desire to have his last name changed to Arthur." The trial court dismissed the petition in its entirety and did not specifically state why the child's name was not being changed. Father presented no sworn testimony or other evidence about this issue, and we find that it was properly dismissed as part of the custody petition. "The parent seeking to change the child's surname has the burden of proving that the change will further the child's best interests." *Barabas v. Rogers*, 868 S.W.2d 283, 287 (Tenn. Ct. App. 1993). Among the criteria for determining whether changing a child's surname will serve the child's best interests are: (1) the child's preference, (2) the change's potential effect on the child's relationship with each parent (3) the length of time the child has had its present surname, (4) the degree of community respect associated with the present and proposed surname, and (5) the difficulty, harassment, or embarrassment that the child may experience from bearing either its present or its proposed surname. *Id.* Father failed to carry his burden on this issue by presenting no evidence whatsoever about whether the name change would serve Dillon's best interests.

Oct. 6, 2006), we find no abuse of discretion in the trial court's determination that contempt sanctions were not necessary at this time.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to Appellant, Randal Arthur, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE