

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00073-CV

———————————————

IN THE INTEREST OF Z.J., A CHILD

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-679090-20

Before Birdwell, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

**MEMORANDUM OPINION**

Mother and Father appeal from an order naming the Texas Department of Family and Protective Services as permanent managing conservator of their child and denying the parents even possessory conservatorship. The parents contend that the evidence is insufficient to support such an order. We hold that Father's persistent drug use, Mother's physical abuse, and other detriments shared between them justify the order from an evidentiary standpoint.

Mother raises other challenges, but they are either inadequately briefed or unpreserved. Ergo, we affirm.

## I. BACKGROUND

Father is the biological parent of Mother's youngest child, a baby whom we will refer to as Zeke.[1] The Department received a number of troubling reports concerning Mother, Father, and their children. Based on those reports, the Department removed the children and initiated these proceedings to terminate Mother's and Father's parental rights to Zeke.

At trial, it was established that some of the children were previously sexually assaulted by Mother's former husband. There was also evidence that Mother's current paramour, Father, regularly used methamphetamine and thwarted drug tests by cutting his hair and nails short. Mother also tested positive for trace levels of

---

[1]To protect the minor's identity, we refer to the family members using pseudonyms. *See* Tex. Fam. Code Ann. § 109.002(d); *In re J.P.*, 598 S.W.3d 789, 791 (Tex. App.—Fort Worth 2020, pets. denied).

methamphetamine once during the child welfare case. During a period when Father was incarcerated, Mother allowed one of Father's acquaintances from jail, Cedric, to stay in the house and care for the children despite his known anger issues. Witnesses testified that during Father's jail stint, his daughter was taken to the hospital with a broken leg, and Cedric called the Department to report that Zeke was injured as well. The Department's investigator testified that when she pressed Mother for an explanation at the hospital, Mother confessed to injuring Zeke but claimed it was unintentional, though Mother later denied making any such confession and shifted blame for the injuries onto Cedric. After Father's release and the return of the other children aside from Zeke, Mother often left Father to care for the children despite his persistent methamphetamine use.

After hearing this evidence, the trial court denied termination of Mother's and Father's parental rights to Zeke. However, the trial court found that appointing Mother and Father as managing conservators would not be in the child's best interest and would significantly impair the child's physical health or emotional development. So, the trial court awarded sole permanent managing conservatorship to the Department. Additionally, the trial court denied Mother and Father possessory conservatorship, though the court did grant supervised visitation three times a month conditioned on successful drug testing. Finally, the court ordered Mother and Father to pay child support and medical support to the Department. Mother and Father appealed.

3

## II. SUFFICIENCY OF THE EVIDENCE

In her first two issues, Mother challenges the sufficiency of the evidence to support the award of sole managing conservatorship to the Department rather than to Mother, and Father brings a similar challenge.[2] In her third issue, Mother contests the denial of possessory conservatorship.

### A. Applicable Law

Conservatorship determinations made after a bench trial are governed by a preponderance-of-the-evidence standard. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). The appointment of a conservator is subject to review for abuse of discretion and may be reversed only where the decision is arbitrary and unreasonable. *Id.* Under the abuse-of-discretion standard, legal and factual insufficiency are not independent grounds for asserting error; they are merely relevant factors in assessing whether a trial court abused its discretion. *In re S.T.*, 508 S.W.3d 482, 489 (Tex. App.—Fort Worth 2015, no pet.). An abuse of discretion does not occur for want of evidence when the

---

[2]In Father's statement of issues, he also argues, "There was not enough evidence to support the trial court's decision to grant permanent managing conservatorship to the Department as Appellant was incarcerated when the child was injured." He continues, "The Department failed to provide drug treatment services to Appellant until one week before trial." However, if Father intended for these sentences to serve as issues, he offered no argument or authority to support them, and we deem them inadequately briefed. *See* Tex. R. App. P. 38.1(i) (requiring a clear and concise argument with appropriate citations to legal authorities); *In re T.T.F.*, 331 S.W.3d 461, 477–78 (Tex. App.—Fort Worth 2010, no pet.). Father's only adequately briefed argument concerns whether naming the Department as managing conservator was in Zeke's best interest.

4

trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Id.* at 490.

A child's best interest is the primary consideration in determining conservatorship issues. Tex. Fam. Code Ann. § 153.002; *Danet v. Bhan*, 436 S.W.3d 793, 796 (Tex. 2014) (per curiam). A best-interest determination is guided by the nonexclusive *Holley* factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). A court need not have evidence on every element listed to make a valid finding as to the child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re E.S.*, No. 02-20-00407-CV, 2021 WL 2149627, at *7 (Tex. App.—Fort Worth May 27, 2021, no pet. h.) (mem. op.). While no one factor is controlling, analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the best interest of the child. *E.S.*, 2021 WL 2149627, at *7; *In re R.J.*, 579 S.W.3d 97, 114 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

5

There is a presumption that appointment of a parent as managing conservator is in the child's best interest. Tex. Fam. Code Ann. § 153.131(a); *S.T.*, 508 S.W.3d at 491. A nonparent can rebut the presumption by showing that appointment of the parent would significantly impair the child's physical health or emotional development. Tex. Fam. Code Ann. § 153.131(a); *S.T.*, 508 S.W.3d at 491. To show significant impairment, the nonparent must identify specific acts or omissions by the parent which demonstrate that an award of custody to the parent would result in physical or emotional harm to the child. *S.T.*, 508 S.W.3d at 492; *In re S.W.H.*, 72 S.W.3d 772, 777 (Tex. App.—Fort Worth 2002, no pet.) (quoting *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990)). "Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by the parent." *S.T.*, 508 S.W.3d at 492.

If a managing conservator is appointed, the court may appoint one or more possessory conservators. Tex. Fam. Code Ann. § 153.006(a); *In re B.P., Jr.*, No. 2-07-251-CV, 2008 WL 2639264, at *6 (Tex. App.—Fort Worth July 3, 2008, no pet.) (mem. op.). When a parent is not appointed as a managing conservator, the Family Code calls for the parent to be appointed as a possessory conservator unless a court finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child.

6

Tex. Fam. Code Ann. § 153.191; *Brandon v. Rudisel*, 586 S.W.3d 94, 106 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

**B.    Father**

Father argues that the evidence was insufficient to show that appointing the Department as Zeke's sole managing conservator was in the child's best interest.

To Father's credit, there was some evidence of his ability to provide for Zeke. Father was a successful mechanic, and he helped provide a three-bedroom house where he lived with Mother.  He testified that he kept his schedule flexible to make sure that the children were cared for when Mother was at work, and he spoke affectionately of Zeke at trial.

However, there was no shortage of evidence concerning Father's insobriety, which included both methamphetamine and cocaine use, for which he spent time in jail.  On the rare occasion that he actually took a court-ordered drug test, Father appeared at the testing facility under the obvious influence of drugs, as the test administrator explained:

> A.  [Father's] demeanor was completely 180 from the other previous four to five times that we had met.  He was very anxious.  His thought process was—was interrupted several times.  What—you know, his inability to make complete sentences, body language, just moving about very frequently and rapidly, hand gestures, moving from one topic to another, just not a lot of continuity.  In addition to—
>
> . . . .
>
> Q.  And did you notice any type of odor or aroma about him that caused you concern?

7

A. Yes, ma'am.

Q. And—and what was that?

A. I—I could smell an odor of methamphetamine or the residual from it as if it were perfused through the skin.

The Department caseworker testified that if Father were using drugs in the home, it would not be a safe or appropriate environment for a child. Even Mother's therapist, who supported the parents' bid to retain conservatorship, agreed that if someone were using drugs in the home, it would not be wise for children to remain there. Father's drug use plays into several of the *Holley* factors. *See In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at *9 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op. on reh'g) (concluding that heavy methamphetamine usage, on its own, justified naming the Department as managing conservator due to its harmful effect on a father's life and ability to parent).

A litany of other problems also reflected poorly on Father's parental abilities, the danger to the child, the stability of the home, and the propriety of Father's custody as shown by his acts or omissions. Father referred Cedric, a recently released convict, to live with the children despite Father's knowledge that Cedric had anger issues. Indeed, Mother blamed Zeke's injuries on Cedric; to the extent that the trial court gave any credence to this testimony, the court could have faulted Father for

8

bringing this danger into Zeke's life.[3] Father reportedly admitted beating a previous girlfriend and was referred to a batterer's intervention program.[4] Mother also testified that Father had been diagnosed with several mental disorders.[5] Department witnesses testified that Father refused to provide financial statements and did not successfully complete his service plan. And Father denied responsibility for his actions.[6] He maintained that he cut his hair and nails short (in defiance of a court order) not for the purpose of evading drug testing, but to suit the needs of his job as a mechanic. Father and Mother jointly contended that their positive drug tests were attributable to their innocent use of various medications, though the Department's witnesses testified that Father's medications could not cause a false positive result. Finally, Father asserted that the Department's records concerning his various periods of incarceration were incorrect.

---

[3]See E.S., 2021 WL 2149627, at *8 (weighing whether there is domestic violence "by the child's family or others who have access to the child's home" in the conservatorship calculus).

[4]See id. at *9 (concluding that domestic violence, even when the child is not the target, tended to support denying a parent managing conservatorship).

[5]See In re R.R., No. 02-13-00464-CV, 2014 WL 3953930, at *3 (Tex. App.—Fort Worth Aug. 14, 2014, no pet.) (mem. op.) (relying in part on a mother's "mental disorders" in upholding a denial of managing conservatorship).

[6]See In re B.O., No. 02-16-00485-CV, 2017 WL 2590571, at *25 (Tex. App.—Fort Worth June 15, 2017, no pet.) (mem. op.) (stating that considerations for conservatorship "include parental irresponsibility").

Taking this evidence together and surveying it under our deferential standard of review, we conclude that the trial court did not abuse its discretion by determining that naming Father as Zeke's managing conservator was not in the child's best interest. *See M.D. v. Tex. Dep't of Family & Protective Servs.*, No. 03-20-00531-CV, 2021 WL 1704258, at *9, *12–13 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.) (concluding that evidence of a mother's methamphetamine use and child mistreatment was insufficient to support termination but that it was sufficient, along with other evidence, to support naming the Department as sole managing conservator).

We overrule Father's issues.

## C.    Mother[7]

In Mother's first, second, and third issues, she asserts the evidence is insufficient to justify naming the Department as sole managing conservator and to deny Mother possessory conservatorship.

In Mother's favor, there was evidence of her commitment and ability to provide for Zeke emotionally and financially. Mother testified that at the time of trial,

---

[7]In what Mother dubs issue 3a, she challenges the admission of her drug test results into evidence. However, Mother does so with only one sentence of argument, which reads, "Courts of Appeal have recognized the need to show that drug tests results have been properly preserved or generated an [sic] also that they were produced by the use of proper procedures and methods." We hold this argument inadequately briefed; where, as here, an appellant provides a one-sentence proposition of law without any legal analysis, discussion, or argument explaining why the complained-of evidence was inadmissible, nothing is presented for our review. *See* Tex. R. App. P. 38.1(i); *Lozada v. Farrall & Blackwell Agency, Inc.*, 323 S.W.3d 278, 287 (Tex. App.—El Paso 2010, no pet.).

she had a steady job at a warehouse, a house with a separate bedroom for Zeke, and a family support system that she could rely on as a resource for childcare and for her own therapeutic needs. Mother said that she previously quit a demanding job at a law firm to be able to comply with her service plan. Aside from one positive drug test, Mother otherwise tested negative for drugs, and her counselors believed that Mother was not a regular drug user.

There was also evidence that Mother had made significant changes to better herself and her relationship with the children. She explained that before the children were removed, she was overwhelmed by the burden of raising five children on her own. Mother believed that her circumstances had changed for the better, though, because she had gained a coparent in Father, supportive friends, and new techniques that she learned in therapy for dealing with stressors. Mother's therapist testified that Mother made improvement over the course of their counseling sessions, especially in that she took more responsibility for the children's problems. Finally, Mother had cared for Zeke's siblings without incident since the Department had agreed to their monitored return.

But the Department's caseworker testified that Zeke was different from the other children because, as a baby, he was incapable of protecting himself from abuse. And there was evidence that Mother did in fact severely abuse Zeke.[8] A Department investigator testified she received a call from Cedric reporting that Zeke was injured.

[8]*See S.T.*, 508 S.W.3d at 492.

11

The investigator met Cedric in a parking lot and took Zeke to the hospital, where Father's daughter was being treated for a broken leg, the source of which was never explained at trial.[9]  Photos taken at the hospital depicted a baby with heavy bruising across both sides of his head, including the entire left side of his face, as well as welts and scratches on his chest and neck.  The investigator testified that when she confronted Mother with the photos at the hospital, Mother confessed to injuring the child:

> [Mother] denied the injuries at first.  And after I showed her the pictures of the extensive bruising to his entire face, she admitted to, like, pushing him down in a bathtub because she was upset that he was trying to crawl out of the bathtub.  So she admitted to, like, pushing him kind of down into the bathtub.

At trial, Mother denied making any such confession and instead blamed the injuries on Cedric.[10]

This abuse (and denial of responsibility for the abuse) stood alongside several other failings that further supported findings against Mother on endangerment, significant impairment, and best interest.  While Father was incarcerated, Mother allowed a recently released convict with anger issues to stay in the home and care for

---

[9]When the Department filed its petition to remove the children, it submitted an affidavit that relayed one of the children's account of how the broken leg had occurred: during a babysitting session, mother's eldest son had jumped on the child's leg and intentionally broken it out of frustration with Mother's constant absence from the squalid family home, but Mother did not immediately seek medical care for the child because Mother viewed her as a "lying[,] thieving bitch" and thought that the child was malingering.

[10]*See B.O.*, 2017 WL 2590571, at *25.

12

the children on his own.[11]  After Father's release, Mother often left Father—a regular methamphetamine user—in charge of the children.[12]  Mother also tested positive for methamphetamine.  Mother's own therapist agreed it would not be wise for the children to remain in an environment of drug use.  Moreover, Mother refused to allow the Department access to the home to verify its condition, refused to provide account statements to verify her financial situation, and refused to provide a list of her medications even though she professed that her and Father's positive drug tests were caused by use of medications.  And as to the *Holley* factor concerning programs available to assist the parents, Mother testified that she would not seek any further counseling unless it was required for Zeke's return.

Viewed together, these acts and omissions justified the trial court's finding that awarding managing conservatorship to Mother would significantly impair Zeke's health and development and would not be in his best interest, and that the child's interests would be best served by appointing the Department as sole managing conservator.  *See S.T.*, 508 S.W.3d at 491–92.  Furthermore, the trial court could have fairly found that the appointment of Mother as possessory conservator would not be in Zeke's best interest and would endanger his welfare.[13]  *See* Tex. Fam. Code Ann.

---

[11] *See E.S.*, 2021 WL 2149627, at *8.

[12] *See M.D.*, 2021 WL 1704258, at *9, *12–13; *D.D.M.*, 2019 WL 2939259, at *9.

[13] While the trial court declined to appoint Mother as possessory conservator and made findings concerning other issues in the case, the trial court did not make the

§ 153.191; *Brandon*, 586 S.W.3d at 106. The trial court therefore did not abuse its discretion in naming the Department as Zeke's sole managing conservator and denying Mother even possessory conservatorship.

We overrule Mother's first three issues.

### III.   CONDITIONS OF CONSERVATORSHIP

In her fourth, fifth, and sixth issues, Mother contests the terms of the trial court's conservatorship order. Specifically, Mother protests the order's requirement that she pay $113 per month to the Department in order to defray the cost of supporting Zeke. Mother also objects to the trial court's failure to set specific guidelines for her possession of and access to Zeke, as well as a provision that,

---

findings that are required for denial of possessory conservatorship: that the appointment was not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child. *See* Tex. Fam. Code Ann. § 153.191. "The judgment may not be supported upon appeal by a presumed finding upon any ground of recovery or defense, no element of which has been included in the findings of fact . . . ." *Luna v. Pickel*, No. 02-19-00371-CV, 2020 WL 5949927, at *5 (Tex. App.—Fort Worth Oct. 8, 2020, no pet.) (mem. op.) (quoting Tex. R. Civ. P. 299).

However, on appeal, Mother does not assign error or brief any challenge concerning the absence of these findings. *See Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 782 (Tex. 2020). "A court of appeals may not reverse a trial court judgment on a ground not raised." *Id.* "Our adversary system of justice generally depends 'on the parties to frame the issues for decision and assigns to courts the role of neutral arbiter of matters the parties present.'" *Id.* (cleaned up) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243, 128 S. Ct. 2559, 2564 (2008)). "The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one." *Id.* (quoting *United States v. Burke*, 504 U.S. 229, 246, 112 S. Ct. 1867, 1877 (1992) (Scalia, J., concurring)). The absence of these findings therefore may not serve as a basis for reversal.

14

according to Mother, empowers the Department to set ambiguous conditions on her possession and access.

The Department responds that because Mother never raised these arguments in the trial court, they are not preserved. We agree with the Department.

"To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion." *In re C.H.*, 412 S.W.3d 67, 78 (Tex. App.—Fort Worth 2013, pet. denied). "If a party fails to do this, error is not preserved." *In re J.C.*, 594 S.W.3d 466, 473 (Tex. App.—Fort Worth 2019, no pet.). This rule conserves judicial resources by giving trial courts an opportunity to correct an error before an appeal proceeds, promotes fairness among litigants by prohibiting them from surprising their opponents on appeal, and furthers the goal of accuracy in judicial decision-making by allowing the parties to develop and refine their arguments and allowing the trial court to analyze the questions at issue. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 510 (Tex. 2018) (op. on reh'g). An appellate court generally cannot reverse based on a complaint not raised in the trial court. *C.H.*, 412 S.W.3d at 78–79.

"An exception to the preservation-of-error requirement applies when the alleged error is 'fundamental.'" *Menchaca*, 545 S.W.3d at 510. But Mother has not argued that any of the complained-of provisions constitute fundamental error, and we find no authority suggesting that they are. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d

572, 577 (Tex. 2006) (collecting cases where the fundamental-error doctrine applies, but not including the complaints at issue here); *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003) (same).

Ergo, because Mother never raised these complaints in the trial court, we overrule her remaining issues. *See* Tex. R. App. P. 33.1(a); *see, e.g.*, *In re H.E.W.M.*, No. 04-19-00202-CV, 2020 WL 1866466, at \*4 (Tex. App.—San Antonio Apr. 15, 2020, pet. denied) (mem. op.) (rejecting an argument against medical support obligations because the father "did not specifically request a modification of the medical support obligation in his counter-petition, at the hearing, or in his post-hearing motions, and he did not present an objection to the trial court that the cumulative amount of his medical support obligations exceeds nine percent of his resources").

## IV. CONCLUSION

We affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: August 5, 2021

16