# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### NOVEMBER 8, 2007 Session

## NINA LOUISE JAMES BUMPUS v. SCOTT MICHAEL BUMPUS

**Direct Appeal from the Chancery Court for Madison County**
**No. 59525      Ron E. Harmon, Chancellor**

---

**No. W2007-00395-COA-R3-CV - Filed March 25, 2008**

---

This appeal involves a change in child custody and a petition for contempt. When the parties divorced, they agreed upon a parenting plan providing that Mother would have primary custody of their two sons. Less than a year later, Father filed a petition to modify the parenting plan, seeking primary custody. Mother filed a counter-petition, also seeking modification of the parenting plan. She also filed a petition to cite Father in contempt. Since the divorce, Mother had become pregnant by another man, and she did not tell the child's father that the child was born. Mother also lied to Father and others about the circumstances surrounding the child's birth. Mother had remained unemployed since the divorce, and her only source of monthly income was child support from Father for his two sons. The parties' oldest son was doing poorly in school and was frequently tardy or absent. The trial court found that a material change in circumstances had occurred, and that it was in the best interest of the children for Father to have primary custody. The court also found that Father's actions did not rise to the level of contempt. Mother appeals, challenging the trial court's decision to change custody, its refusal to find Father in contempt, and other procedural issues. Finding no error, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., joined, and W. FRANK CRAWFORD, J., did not participate.

William Bryan Penn, Memphis, TN, for Appellant

Larry Rice, Memphis, TN, for Appellee

**OPINION**

**I. FACTS & PROCEDURAL HISTORY**

Nina Louise James Bumpus ("Mother") and Scott Michael Bumpus ("Father") were married in 1994 and had two sons during their marriage. Carter Bumpus was born on August 13, 1997, and Brandon Bumpus was born on February 28, 2000. Both children have special needs. Carter has attention deficit hyperactivity disorder, or "ADHD," and anxiety. Brandon has asthma and cystic fibrosis, which, according to one of his doctors, "is a genetic disorder which causes a progressive multi-system disease, most notably chronic lung disease and pancreatic insufficiency." Thick, highly viscous mucus forms in the bronchial passages, leaving the lungs susceptible to infection and consequent inflammation, and the mucus can also obstruct the ducts leading from the pancreas. Treatment for the respiratory component of cystic fibrosis includes airway clearance techniques, such as breathing treatments and chest percussions, as well as several prescribed medications. Brandon must also take pancreatic enzymes when he eats to aid in digestion, and he needs vitamins and nutritional supplements to meet caloric demands to increase his weight. Brandon's daily treatments can take up to two and a half hours, and his condition requires frequent trips to Vanderbilt University Children's Hospital for appointments with pediatric pulmonologists, cystic fibrosis specialists, and gastroenterologists.

Mother filed a complaint for divorce on February 28, 2002, and Father subsequently counterclaimed for divorce. A temporary parenting plan was entered, providing that the children would primarily reside with Mother. The children would be with Father on alternating weekends and every Wednesday after school until he took them to school Thursday morning.

On March 8, 2004, Father moved the court for an order requiring Mother to submit to a vocational evaluation regarding her earning capacity. The trial court ordered the vocational evaluation, and Mother was evaluated by a certified rehabilitation counselor. The counselor's report stated that Mother did not attend the last two years of high school, but she received a diploma by mail after being home schooled. Several assessment and achievement tests were administered, and on one such test, Mother scored on a sixth grade reading level and a fourth grade math and spelling level. Her scores were consistent on another similar test.

Father also filed a motion pursuant to Rule 35.01 of the Tennessee Rules of Civil Procedure seeking an order requiring Mother to submit to a mental examination. He contended that Mother was having difficulty retaining reality and recalling events, and a mental examination was necessary to determine her fitness as a custodian of the parties' children. Father asked that the examination be performed by one of three doctors he listed, "as chosen by counsel for [Mother]." Father subsequently filed a revised motion to require a mental examination, stating that Carter's psychologist recommended that his parents be evaluated. Father's revised motion listed two other doctors that Mother's counsel could choose to perform the exam. On September 13, 2004, the trial court ordered Mother to submit to a mental examination by John Leite, Ph.D., who was one of the five doctors listed in Father's motions.

On October 27, 2004, the trial court entered a final decree of divorce, which approved and incorporated a permanent parenting plan and marital dissolution agreement entered into by the parties. Mother's mental examination had not yet been completed. The agreed upon parenting plan provided that the children would reside with Mother, except that every other week, Father would pick the children up from school on Thursday and return them to school on Monday. Father would have the children for six weeks during summer vacation, and on alternating holidays. The parenting plan further provided that the children would continue to be enrolled at the University School of Jackson ("USJ") for elementary and high school, and Father would pay their tuition.

On September 1, 2005, Father filed a petition to modify the final decree, alleging that a change of circumstances had occurred and it was no longer in the children's best interest to reside with Mother. According to Father's petition, Mother had claimed that a known person repeatedly assaulted and raped her, possibly at her home. Father contended that Mother had created an unsafe and dangerous environment for the children. In the alternative, Father suggested that Mother could not distinguish fantasies from reality and was suffering from a serious mental health problem. Alternatively, Father alleged that Mother may have falsely reported such criminal activity in an effort to cover her inappropriate sexual activities. Father claimed that Mother had such poor judgment that she should not be the primary custodian of the children. Father filed another motion to require Mother to submit to a mental examination by Dr. John Leite, the clinical psychologist, because the previously ordered examination was never completed.

Mother filed a response to Father's petition, and she also filed a counter-petition to modify the final divorce decree. Mother acknowledged in her petition that she was pregnant and expecting a third child. Mother requested that the parenting plan be modified, alleging that Father had acted maliciously toward her, engaged in inappropriate activity, failed to administer the necessary medicines to Brandon for his cystic fibrosis, and otherwise failed to comply with the parenting plan. She also claimed that Carter was struggling in school and noticeably falling behind his classmates because Father did not care for him during his parenting time.

On October 3, 2005, a consent order was entered stating that both parties agreed to submit to psychological evaluations by Dr. John Leite as soon as practicable. On February 8, 2006, Father filed a motion for sanctions against Mother because she had not completed her evaluation, and she allegedly failed to keep her appointments with Dr. Leite. Mother filed a "Motion to Appoint New Psychologist for Evaluation," claiming that Dr. Leite was "too busy" to conduct the evaluations. The trial court subsequently denied Mother's motion and ordered her to complete her psychological evaluation with Dr. Leite within ten days or provide written documentation from Dr. Leite that he was unable to complete the evaluations within that time period. The order further stated that after Dr. Leite's report was filed, the trial judge might entertain a reconsideration of Mother's motion to appoint a new psychologist.

Mother filed a petition to cite Father in civil and criminal contempt alleging that Father had violated court orders by failing to administer all of Brandon's medications; pay the children's

babysitter; pay 80% of uncovered medical bills; provide his income information for the previous year; and consult with Mother about where to enroll the children in school.

Pursuant to the original parenting plan, Father had visitation with the children for six weeks during their summer vacation, and his six-week visitation began on June 1, 2006. The trial judge heard testimony on June 30 and July 17, 2006, then entered a temporary order, effective August 1, 2006, granting primary custody to Father pending a further hearing. The trial concluded on September 13, 2006, after the court had heard live testimony from a total of twelve witnesses. In addition, the parties introduced excerpts from depositions of three of the children's physicians regarding the children's medical needs.

One of Brandon's doctors from the Vanderbilt Cystic Fibrosis Center testified by deposition that people with cystic fibrosis have an average survival of 36 years, and survival depends largely on the care children are able to receive. He explained the daily care and attention required from parents, as well as the need for specialty care from physicians. At some point, Father had suggested that Mother might suffer from Munchausen syndrome, or Munchausen syndrome by proxy. The children's pediatrician stated that Mother was very attentive to their medical care, but he did not observe that she misreported or exaggerated any of their physical conditions, or that she made excessive demands for appointments or medications. The pediatrician stated that Father was also a concerned parent. In summary, the pediatrician said that both children were "well cared for medically."

A clinical psychologist who had evaluated both children also testified by deposition. The psychologist discussed Carter's problems with anxiety and ADHD and opined that "a less accelerated school environment" may be appropriate for Carter. He explained that Carter was having difficulty completing assignments on time at his current school, and having to make up work only contributed to his stress levels. The psychologist also stated that he had observed the signs of ADHD in Brandon, but he said it would be difficult to treat Brandon's ADHD with medication because of its effect on his cystic fibrosis.

Carter was in second grade at USJ during the 2005-2006 school year, and Brandon was in pre-kindergarten. Carter's second grade teacher, Ms. Phyllis Gayton, testified that Carter was a bright student who tried hard, but it was difficult for him to stay on task. She also stated that when Carter was tardy or missed school, he became further behind, and he oftentimes had to finish work during recess. Ms. Gayton testified that she wrote several notes to Mother asking her to try to get Carter to school at 7:30 each morning so that he could have extra time to complete his work. The school day did not actually start until 7:50. Ms. Gayton also tried to communicate with Mother via email, and she would speak to her in person when Mother came to school. However, Mother rarely responded to Ms. Gayton. Some of Ms. Gayton's notes to Mother from Carter's assignment book were introduced as exhibits to her testimony. Carter's report card reflected that he was absent eight times that year, and he was tardy twenty-one times, meaning he arrived after 7:50. Ms. Gayton testified that Father never brought Carter to school late on his visitation days. On cross-examination, Ms. Gayton testified that she could say "pretty definitively" that Father was not responsible for

Carter being tardy because sometimes she would see Mother dropping Carter off late, and she also tried to keep Carter's visitation schedule in mind. Ms. Gayton testified that Father was an involved parent who telephoned or emailed her at least once a week and attended conferences.

Ms. Gayton testified that Mother would sometimes interrupt her classroom by simply walking in unannounced while she was teaching. Mother would sometimes want to speak with Ms. Gayton, but other times, she would talk to Carter for a few minutes and then leave without even speaking to Ms. Gayton. Carter's assignment book contained a note from Ms. Gayton asking Mother to please call or send a note with any messages because it was difficult to talk to Mother at the door during teaching time. Carter's final grades included three B's and one C. He was the only child in Ms. Gayton's class who did not complete his quarterly at-home reading assignment quota.

Father had remarried on November 29, 2005, after he had filed the petition to modify the parenting plan. Father's new wife, Angela, had one daughter who was eleven years old. Angela testified that she loved Carter and Brandon very much. Angela was certified as an emergency medical technician and had previously worked as a paramedic. She testified about helping Brandon with his breathing treatments and administering his medication, as well as traveling with him to Vanderbilt for his appointments. Brandon had one appointment at Vanderbilt soon after Father's summer visitation began, and Brandon's doctor discussed the possibility of inserting some type of feeding tube if he did not begin to gain weight. Father and Angela supplemented Brandon's diet and allowed him additional time at meals. At Brandon's next appointment two weeks later, his doctors determined that he was gaining weight, and a feeding tube would not be necessary.

Angela was currently working at Father's family's business, but her work schedule was flexible, and she could usually work from home when the children were not in school. She testified about how she and Father tried to help Carter with his school work. Angela also described various charity fundraisers she and Father had organized in order to raise money for cystic fibrosis research. Angela and the three children were enrolled in taekwondo classes together, and she testified about occasions when Mother would come to their class and call Carter over to her, interrupting the class. Angela also testified that Mother recently came to Father's family's business with Carter and Brandon, and she was wearing some type of "IV device" on her side. Mother told Angela that she had breast cancer, and the device was providing chemotherapy.

Father testified that he filed the petition to modify the parenting plan because Mother's home environment had begun to "unravel" in such a way that it was affecting the children. First, Father testified about his reasons for suspecting that Mother was mentally unstable. He explained that Mother had been wearing some sort of pouch on her side, with an IV line running beneath her shirt that she said was for chemotherapy. Mother told Father that she had a cancerous mass on her stomach. Eventually, Father learned that Mother did not have cancer, but she was pregnant. When Father asked Mother if she was pregnant, Mother told him she was pregnant as a result of being sexually assaulted at her home. Mother said that she had filed police reports, but she told Father that he would not be able to find the reports at the police station because the police "red flagged them" for her. Father later learned that Mother had not been raped, but she had engaged in consensual

unprotected sex. Mother gave birth to a third child, a daughter, but she did not tell the child's father about her birth or seek any child support from him. Mother had remained unemployed since the divorce in 2004, and her only source of income was the child support Father paid for Carter and Brandon.

Father also explained that Carter was having problems at school, and Mother could not get him to school on time. Father testified that when he had the children on school nights (every other Thursday and Sunday night), he set a routine or schedule regarding homework and bedtime. He also testified that he communicated with Carter's teacher every week. Father insisted that he had never taken the children to school late, and that they arrived at school each morning by 7:30. Father had arranged for Carter to be tutored during the summer, and he said it was going well. Father stated that he wanted the children to remain at USJ, even though he was responsible for paying the private school's tuition, and Mother wanted to enroll the children in a public school. It was Father's belief that the children's academic problems were not due to the school system, but due to Mother's lack of encouragement and failure to take them to school on time. On the final day of trial, September 13, 2006, Father testified that the children were back in school and "doing fabulous."

Father also testified about the children's medical needs. He explained how he and Angela worked together to meet those needs, and how they were successful in helping Brandon to gain weight. Carter, on the other hand, was overweight when he came to live with Father. Father had taken Carter to a dietician and was encouraging him to become involved in physical activities. Father stated that Carter had lost some weight and was feeling better about himself.

Mother testified that she did not have cancer, but she also claimed that she never told Father or his wife that she had cancer or was receiving chemotherapy. According to Mother, she was prescribed a "Zofran pump" to wear while she was pregnant, which she described as a type of IV bag containing medicine for nausea. Mother stated, "When I told him that I was in fact pregnant, he assumed that I had cancer . . . ." On cross-examination, Mother acknowledged telling Father and his wife that she had a "breast biopsy."

Mother admitted that she had twice falsely alleged that she was the victim of sexual assaults, and she had claimed that her pregnancy was the result of such a sexual attack. Mother stated that the father of her third child wanted Mother to have an abortion, and after he left town, she did not contact him to tell him that she gave birth to the child. Mother said she did not know whether the child's father was employed, and she had not taken any steps to "track him down" or obtain child support from him. Mother said that she had not applied for any jobs since she divorced Father, and she was using the money awarded from the division of marital property as her means of support. The children's former babysitter, who was a friend of Mother, testified that Mother had been struggling financially.

When asked about the children's school situation, Mother acknowledged that she had problems communicating with Carter's teacher. Mother denied ever having interrupted Ms. Gayton's classroom, but she said that one time she went in and "quietly slipped" a book to Carter

that he had forgotten. Mother denied taking Carter to school late, and she claimed that Ms. Gayton could not have known who was dropping him off late. Mother also testified that Ms. Gayton never sent notes home regarding Carter being late for school; however, she later identified several notes from Ms. Gayton requesting that Carter be dropped off by 7:30. During her deposition, Mother had stated her belief that Carter was simply given extra work and deprived of his recess as a form of punishment by the school.

Mother stated that she and Father had a "somewhat difficult" relationship since the divorce. Mother testified that sometimes she is unable to reach the children by telephone when they are visiting Father. Father's wife, Angela, testified that they sometimes do not answer Mother's phone calls if she calls while they are eating or bathing the children. Once during Father's visitation, he told Brandon to get off the telephone with Mother because it was bedtime, and Mother instructed Brandon to tell Father to "shut up." Father testified that Mother recently refused to let the children visit Father on his designated holiday.

Mother also testified about the various bases of her petition to cite Father in contempt. Father testified about his attempts to comply with each of the relevant court orders. For example, Mother claimed that Father was not properly dispensing the children's medications. Mother and her mother were counting the amount of medication they sent to Father's house for each of the children's visits, and how much remained when the children returned, to conclude that Father was not administering the proper dosages. Father explained that he had his own supply of some of the children's medications, so he did not always use the bottles that Mother sent. Father also testified that he followed the dosage instructions on the prescriptions, not Mother's instructions.

Next, Mother claimed that Father had failed to pay the cost of the children's babysitter and 80% of the children's uncovered medical expenses. Father testified that he mailed a check to the babysitter on three different occasions, and it was returned each time because she would not accept delivery. The babysitter testified and admitted that she had declined mail from Father. Regarding the medical bills, Father stated that Mother would not provide copies of the bills to Father, as required by the parenting plan. Father stated that he had paid every bill submitted to him. Mother also alleged that she had not received proof of Father's life insurance or an affidavit of his income for the previous year, as required by the parenting plan. Father testified that the necessary documents had been provided to Mother's attorney.

Mother claimed that Father failed to pay her $1800 per month in child support during August, as required by the original parenting plan. Father explained that since he had primary custody of the children effective August 1, 2006, pursuant to the temporary order, he only paid $1000 in child support to Mother, just as he usually did when the children resided with him during the summer months.

Dr. John Leite reported on his psychological evaluations of Father and Mother. Dr. Leite had interviewed both parties and reviewed their depositions, the children's medical records, the depositions of the children's doctors, and the vocational evaluation of Mother that was performed

during the original divorce proceedings. One of Dr. Leite's colleagues collected psychometric test data from both parties, which Dr. Leite also reviewed. Mother would not sign a release for Dr. Leite to review her medical history or therapist's records, but she stated that she was taking an anti-depressant as prescribed secondary to stress. Dr. Leite concluded that neither party's test data suggested any major psychopathology, and Mother's test data did not suggest the presence of Munchausen's syndrome by proxy or sociopathy, as Father had alleged. However, Mother's test data did indicate other concerns and situational distress. Dr. Leite's report stated, regarding Mother:

> [I]nterview and test data suggest a psychologically low functioning individual whose significant anxiety coupled with poor self-confidence, lack of sophistication and overwhelming environmental demands contributes to poor judgment and poor decision making on her part. Her deficits in academic achievement, her previous school history and deficits in mathematics, spelling and reading ability would make her involvement in her children's school experience problematic. She is certainly committed to her children and appears simply overwhelmed by their needs.

Dr. Leite testified that Carter and Brandon placed incredibly high demands on the parents because of their special needs, and Mother had "poor adaptive responses to stress," so that she simply becomes overwhelmed. Dr. Leite further testified that caring for a newborn child along with two "significantly high maintenance" children would only contribute to Mother's stress and sense of being overwhelmed. He also described Mother as tending to be overprotective of the children and expressed concerns regarding "dependency fostering."

Dr. Leite also stated that children with ADHD need a structured environment, and he observed that Carter was having significant academic problems that required intense parental involvement. He stated that Father demonstrated very superior intellectual ability, and Father was concerned that Mother allowed the children to be frequently absent from school or tardy. Dr. Leite concluded from Mother's discussions of the children's teachers that Mother viewed "fairly typical academic expectations as harsh and too demanding." Dr. Leite noted that Mother wished to remove the children from USJ, and Dr. Leite questioned that decision.

Mother retained another clinical psychologist, Dr. John Ciocca, to review Dr. Leite's evaluation. However, Dr. Ciocca did not independently evaluate Mother. From Dr. Ciocca's review of the record, he agreed with Dr. Leite's conclusion that Mother did not suffer from any major psychopathology or Munchausen's Disorder by proxy. However, Dr. Ciocca disagreed with Dr. Leite's conclusion that the record demonstrated poor judgment and poor decision making by Mother. On cross-examination, Dr. Ciocca acknowledged that it would be an indication of poor judgment if Mother did in fact take Carter to school late twenty-one times in one school year, lie about having cancer, and falsely report sexual assaults. Father and Mother had discussed this conduct in their depositions, which were part of the record that formed the basis of Dr. Leite's conclusions. Dr. Ciocca then testified that he wished to "amend" his report to clarify that he saw no indication of poor

judgment or decisions "regarding the rearing of the children on an ongoing basis." In other words, Dr. Ciocca explained that not all poor decisions demonstrate an inability to make reasonable decisions as a parent, and there was no procedure to adequately evaluate parenting capacity. Dr. Ciocca also opined that there was insufficient evidence in the record to support Dr. Leite's conclusion that Mother had "deficits in academic achievement" because Dr. Leite did not independently evaluate Mother's academic ability. Instead, Dr. Leite relied on the vocational evaluation conducted during the original divorce proceedings and the information Mother provided in her interview. Finally, Dr. Ciocca testified that there was an insufficient basis for Dr. Leite to conclude that Mother was overwhelmed by the children's needs because Dr. Leite did not evaluate the relationship between Mother and the children.

Mother also presented the testimony of various friends and family members who generally testified that she was a loving mother. At the conclusion of the testimony, the trial judge reserved ruling until the parties submitted various deposition excerpts and proposed findings of fact. On January 26, 2007, the trial court entered an order containing the following findings of fact and conclusions of law:

> The instant case involves children with needs that will tax the skills of both parents as well as their support groups. While the Court has found the father to be better able to provide day to day care for his sons, that does not diminish the children's need for the love and devotion of their mother.
>
> Both parents have a valuable contribution to make toward the development of these children and it is the hope of the court that each will strive to fulfill that contribution to the best of their ability.
>
> The Court, in considering the contempt allegation against the father, finds his non-compliance is not significant and does not rise to the level of willful contempt. Therefore, it is not punishable as such. Considering these facts and the respective financial positions of the parties, I decline to award either party their attorney fees.
>
> COMES NOW the Court after consideration of all the proof and evidence adduced at the trial of this cause and finds as follows:
>
> FINDINGS OF FACT
> 1. On October 24, 2004, the Court entered a Permanent Parenting Plan in this cause.
> 2. The parties, Scott Bumpus ("Father") and Nina Bumpus ("Mother"), have two children, Brandon Bumpus, age six, and Carter Bumpus, age eight ("the children").
> 3. Brandon Bumpus suffers from Cystic Fibrosis.
> 4. Carter Bumpus suffers from attention difficulty.

5. Since the entry of the Permanent Parenting Plan, both parties allege in their petitions that there has been a change in circumstances.

6. Father could not have foreseen at the time of the entry of the Parenting Plan [] the changes in circumstances that occurred.

7. Since the divorce, Mother became pregnant and gave birth to a third child ("Ashley") out of wedlock.

8. Mother admitted that her pregnancy was an unforeseen change in circumstances.

9. Mother did not inform Ashley's father about Ashley's birth.

10. Mother does not receive, nor has she ever sought support from Ashley's father for the support of Ashley.

11. Mother suffers from high anxiety, low self-confidence, low self worth, and poor adaptive responses to stress.

12. Mother has become overwhelmed since the birth of her third child.

13. Mother's mathematic, spelling, and reading abilities are at the level of [a] fourth to sixth grader.

14. Mother is not supportive of the children's education. Specifically, "she tended to view what seemed to be some normal, typical academic expectations as overly harsh."

15. Since the divorce of Mother and Father, the children have had problems with their schooling and getting to school on time when in the care of Mother.

16. Mother has been late twenty one (21) times bringing the children to school in the past year while this matter was pending.

17. Father has never been late bringing the children to school.

18. Carter Bumpus becomes behind in his schoolwork when he is late or absent from school.

19. Father is "deeply involved in the schooling of both the boys."

20. Since the parties['] divorce, Father has remarried.

21. Defendant's wife, Angela Bumpus ("Stepmother"), is college educated and certified as an Emergency Medical Technician.

22. Father and Stepmother provide the children with a healthy environment, where they encourage the children's success.

23. Father and Stepmother have the children involved in academic and athletic activities.

24. If the children remained in the care of Mother, she would continue "dependency fostering" which could result in the children's anxiety and poor functioning and poor interaction with the outside world.

25. Father will provide the children with "a structured environment as well as academic support for the kids."
26. Neither party is entitled to payment of their attorney fees by the opposing party. The Court costs are to be divided equally between the parties.

CONCLUSIONS OF LAW
1. There has been a material change in circumstances that was not reasonably foreseeable at the time of the entry of the Parenting Plan.
2. It is in the best interests of the children for Father to be their primary physical custodian of the children [sic], and to be the decision making parent.

(citations to the record omitted). A "permanent parenting plan order" was attached to the final order, which provided that Father would have primary responsibility for the care of the children. Mother would have parenting time with the children every Friday after school. On the first and third weekends of each month, Mother would keep the children until 9:00 p.m. on Friday. On the second and fourth weekends, Mother would return the children on Sunday at 6:00 p.m. Major decisions would be made by Father after reasonably consulting with Mother and other knowledgeable persons, such as teachers and physicians. Both parents were ordered to comply with instructions from the children's medical providers. Finally, the parenting plan provided that no child support would be paid pending further orders of the court.

Mother filed a notice of appeal to this Court, but we remanded the case to the trial court for the entry of a final order. On February 14, 2008, the trial court entered a final order setting child support at $20 per week to be paid by Mother, although she remained unemployed. We have determined that this order disposes of all issues and is in fact final.

## II. ISSUES PRESENTED
Mother presents the following issues for review, which we cite from Mother's brief:

1. Whether the trial court erred when it heard matters related to the education of the parties and other factors that were well known prior to the entry of the final decree of divorce, thereby making them *res judicata*.
2. Whether the trial court, in this case, erred in ruling that a material change in circumstances occurred that necessitated changing primary custody of the children from Mother to Father.
3. Whether the trial court erred when it did not exclude the continued involvement of the court appointed psychologist in this matter.
4. Whether the trial court erred when it ruled that the noncompliance by [Father] was not significant, did not rise to the level of willful contempt, and therefore was not punishable.
5. Whether Mother should be awarded attorney's fees incurred by her in this appeal.

Father also seeks an award of attorney's fees on appeal. For the following reasons, we affirm the decision of the chancery court. In addition, we decline to award attorney's fees to either party on appeal.

### III. STANDARD OF REVIEW

In child custody cases, we review a trial court's findings of fact de novo upon the record, with a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). Appellate courts are reluctant to second-guess a trial court's custody decision where so much depends on the trial court's assessment of the witnesses' credibility. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001); *Steen v. Steen*, 61 S.W.3d 324, 328 (Tenn. Ct. App. 2001). Unlike this court, trial courts are in a position to observe the witnesses and to assess their credibility. *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005); *Buckles v. Riggs*, 106 S.W.3d 668, 676 (Tenn. Ct. App. 2003). "Custody decisions often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings." *Joiner v. Griffith*, No. M2004- 02601-COA-R3-CV, 2006 WL 2135441, at *2 (Tenn. Ct. App. July 31, 2006) (citing *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997)). As such, trial courts have broad discretion to fashion custody and visitation arrangements that best suit the unique circumstances of each case. *Joiner*, 2006 WL 2135441, at *2 (citing *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999)). "It is not the function of appellate courts to tweak a visitation order in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). If no error in the trial court's ruling is evident from the record, the ruling must stand. *Id.* In sum, a trial court's decision regarding custody should be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Curtis v. Hill*, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)). We will reverse or modify the trial court's custody decision if we conclude that the decision rests on an error of law, or if the evidence preponderates against the finding that there has been a material change in circumstances.

### IV. DISCUSSION

#### A. Standards for Modifying a Custody Order

Existing custody arrangements are favored because children thrive in stable environments. *Kellett v. Stuart*, 206 S.W.3d 8, 14 (Tenn. Ct. App. 2006). A custody decision, once made and implemented, is considered res judicata upon the facts in existence at that time, or those that were reasonably foreseeable when the decision was made. *Curtis*, 215 S.W.3d at 840; *Kellett*, 206 S.W.3d at 14. Still, courts are authorized by statute to alter a custody arrangement as required by intervening circumstances, or "as the exigencies of the case may require." *Krupp v. Cunningham-Grogan*, No. M2005-01098-COA-R3-CV, 2006 WL 2505037, at *6 (Tenn. Ct. App. Aug. 29, 2006) (citing Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 2006)). Tennessee Code Annotated section 36-6-101(a)(2)(B) provides the following instruction regarding changing custody, in pertinent part:

-12-

If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Therefore, the "threshold issue" in cases involving a proposed modification of an existing custody order is whether a material change in circumstances has occurred since the initial custody determination. *Blair v. Badenhope*, 77 S.W.3d 137, 150 (Tenn. 2002). "Only if the court answers this 'threshold' question in the affirmative does it proceed to perform a new comparative fitness analysis and then determine whether a new custody and visitation arrangement is in the child's best interests." *Krupp*, 2006 WL 2505037, at *7 (citing *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521, at *2 (Tenn. Ct. App. Nov. 25, 2003)). The party petitioning to change the custody order must prove both that a material change in circumstances has occurred and that a change of custody is in the child's best interest. *Kellett*, 206 S.W.3d at 14.

### 1.    Res Judicata

Mother first contends that the trial court erred in considering matters known prior to the divorce decree, such as the parties' educational levels, because of the doctrine of res judicata. "Res judicata is a claim preclusion doctrine that promotes finality in litigation." *In re Estate of Boote*, 198 S.W.3d 699, 718 (Tenn. Ct. App. 2005). The doctrine bars a second suit between the same parties on the same cause of action with respect to all the issues which were or could have been litigated in the former suit. *Id.* As previously stated, once a custody decision is made and implemented, it is considered res judicata upon the facts in existence at that time, or those that were reasonably foreseeable when the decision was made. *Curtis*, 215 S.W.3d at 840; *Kellett*, 206 S.W.3d at 14. The initial decree is conclusive in a subsequent action to change custody "unless some new fact has occurred which has altered the circumstances in a material way to make the welfare of the children require a change in custody." *Rushing v. Rushing*, No. W2003-01413-COA-R3-CV, 2004 WL 2439309, at *5 (Tenn. Ct. App. Oct. 27, 2004) (quoting *Long v. Long*, 488 S.W.2d 729, 731-32 (Tenn. Ct. App. 1972)). In other words, the court cannot entertain a subsequent petition to modify custody unless a material change in circumstances occurred after the initial custody determination. *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003); *Woolman v. Woolman*, No. M2000-02346-COA-R3-CV, 2001 WL 1660714, at *4 (Tenn. Ct. App. Dec. 28, 2001). For purposes of res judicata, a prior judgment or decree does not prohibit re-examination of the same question between the same parties when the facts have changed or new facts have occurred that have altered the legal rights and relations of the parties. *In re Estate of Boote*, 198 S.W.3d at 719 (citing *White v. White*, 876 S.W.2d 837, 839-40 (Tenn. 1994); *State ex rel. Cihlar v. Crawford*, 39 S.W.3d

172, 178 (Tenn. Ct. App. 2000)). Still, the change in circumstances must have occurred after the entry of the custody order sought to be modified, and a party cannot use previously existing facts to show a material change in circumstances. *Costley v. Benjamin*, No. M2004-00375-COA-R3-CV, 2005 WL 1950114, at *5 (Tenn. Ct. App. Aug. 12, 2005).

After a threshold finding that a material change in circumstances has occurred, the court is permitted to make a "fresh determination" of the best interest of the child. *Id.* at *4; *see also* ***Gervais v. Gervais***, No. M2005-01483-COA-R3-CV, 2006 WL 3258228, at *3 (Tenn. Ct. App. Nov. 9, 2006). "This determination should be made according to the factors enumerated in Tennessee Code Annotated section 36-6-106."[1] ***Kendrick v. Shoemake***, 90 S.W.3d 566, 570 (Tenn. 2002).

---

[1] At the time of trial, such factors included:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(a)(8), of child abuse, as defined in §§ 39-15-401 or 39-15-402, or child sexual abuse, as defined in § 37- 1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, as defined in §§ 39-15-401 or 39- 15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a) (2005).

-14-

If the trial court in this case had modified the custody decree solely on the basis of the parties' educations or other similar facts that were known during the divorce proceedings, we would find error in its decision. The original decree was considered res judicata upon those facts. However, that is not the situation we have before us. The trial court specifically found that a material change in circumstances had occurred, which "was not reasonably foreseeable at the time of the entry of the Parenting Plan." Then, the court found that it was in the children's best interest for Father to be their primary custodian. A trial court can and should make a "fresh determination" of the children's best interest if it first finds that a material change in circumstances has occurred since the original decree. In doing so, it should not turn a blind eye to facts that were known at the time of the previous decree.

In making the best interest determination, some of the factors to consider include "[t]he disposition of the parents to provide the child with . . . education," the child's school record, and "[e]ach parent's past and potential for future performance of parenting responsibilities." Tenn. Code Ann. § 36-6-106(a)(2),(6),(10) (2005). Dr. Leite testified that children with ADHD need a structured environment, and he specifically observed that Carter was having significant academic problems that required intense parental involvement. Dr. Leite stated in his report that "[Mother's] deficits in academic achievement, her previous school history and deficits in mathematics, spelling and reading ability would make her involvement in her children's school experience problematic." He noted that Mother allowed the children to be frequently absent from school or tardy, and that she viewed "fairly typical academic expectations as harsh and too demanding." Dr. Leite also indicated that Mother wished to remove the children from USJ, and Dr. Leite questioned that decision. We find that Mother's educational background and abilities were relevant to the best interest analysis to the extent that they affected her willingness to encourage and support Carter and Brandon in their education. Before trial, the judge entered an order specifically stating that he would only revisit issues known during the divorce as they related to the present welfare of the children. We find no error in that decision.

## 2.    A Material Change in Circumstances

Next, Mother contends that the trial court erred in concluding that a material change in circumstances had occurred since the final decree of divorce to justify changing custody. We begin by noting that Mother filed a "Counter Petition to Modify the Final Decree of Divorce" in the trial court and asked the court to modify the permanent parenting plan. Although she did not specifically use the phrase "material change in circumstances," she alleged various ways that Father had failed to comply with the parenting plan since the divorce, which allegedly did not serve the children's best interest. **(Vol.3, p.90).** In *Krupp v. Cunningham-Grogan*, No. M2005-01098-COA-R3-CV, 2006 WL 2505037, at \*7 (Tenn. Ct. App. Aug. 29, 2006), a parent similarly argued to the trial court that a custody order should be modified, then on appeal, claimed that there was no basis for modifying the original order. The Court explained:

> Parties cannot make arguments on appeal that are inconsistent with the arguments they made in the trial court. Thus, having contended in the trial court that there has been a material change in

circumstance sufficient to trigger a judicial reevaluation of the [original] child custody and visitation order, Mr. Krupp is judicially estopped from denying the existence of a material change in circumstance on appeal. *In re Austin S.*, No. M2005-01839-COA-R3-JV, 2006 WL 770455, at *2 (Tenn. Ct. App. Mar. 24, 2006) (No Tenn. R. App. P. 11 application filed); see also *Marcus v. Marcus*, 993 S.W.2d 596, 602 (Tenn. 1999); *Webber v. Webber*, 109 S.W.3d 357, 359 (Tenn. Ct. App. 2003).

*Id.* In another case, we refused to consider a parent's argument on appeal that no material change in circumstances had occurred, when he admitted in his answer that circumstances had changed since the entry of the original decree. *Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2 (Tenn. Ct. App. Aug. 18, 2006).

In any event, we find ample evidence in the record to support the trial court's finding that a material change in circumstances had occurred since the entry of the original decree. There are no bright-line rules for determining whether a material change in circumstances has occurred, but some of the many considerations relevant to the issue include: "(1) whether the change occurred after the entry of the order sought to be modified, (2) whether the change was not known or reasonably anticipated when the order was entered, and (3) whether the change is one that affects the child's well-being in a meaningful way." *Boyer v. Heimermann*, 238 S.W.3d 249, 256 (Tenn. Ct. App. 2007) (citing *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Blair v. Badenhope*, 77 S.W.3d 137 (Tenn. 2002)). "Not every change in the circumstances of either a child or a parent will qualify as a material change in circumstances." *Id.* However, evidence that an existing custody arrangement has proven unworkable in a significant way is sufficient to satisfy the "material change in circumstances" standard. *Id.* In addition, "a parent's change in circumstances may be a material change in circumstances for the purposes of modifying custody if such a change affects the child's well-being." *Kendrick*, 90 S.W.3d at 570.

The chancellor made extensive findings and cited, among other things, that Mother had given birth to a third child, she failed to inform the child's father about her birth or seek any type of support from the father, and Mother had become overwhelmed since the birth of her third child. The court further found that "[s]ince the divorce of Mother and Father, the children have had problems with their schooling and getting to school on time when in the care of Mother." The court found that Mother had been late in taking the children to school twenty-one times in the past year, and Father had never been late. He also noted that "Carter Bumpus becomes behind in his schoolwork when he is late or absent from school." We agree with the trial court's determination that a material change of circumstances occurred that affected the well being of the children in a meaningful way. That is all that is required under the first prong of our analysis.

### 3. Best Interest

Mother also challenges the trial court's conclusion that a change in custody was in the best interest of the children. In making a custody decision, the needs of the children are paramount, while the desires of the parents are secondary. *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996) (citing *Lentz v. Lentz*, 717 S.W.2d 876, 877 (Tenn. 1986)). Custody should never be used to punish or reward the parents; rather, it should promote the children's best interest by placing them in an environment that will best serve their physical and emotional needs. *Id.* "Each parent has his or her own strengths and weaknesses, and it would be unrealistic to measure parents against a standard of perfection." *Krupp*, 2006 WL 2505037, at *6 (citing *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000); *Gaskill*, 936 S.W.2d at 630; *Bush v. Bush*, 684 S.W.2d 89, 93 (Tenn. Ct. App. 1984)). However, if the parents cannot share the responsibilities of joint custody, the courts must decide which parent is comparatively more fit to take on the primary parenting role. *Id.* (citing *Oliver v. Oliver*, No. M2002-02880-COA-R3-CV, 2004 WL 892536, at *2 (Tenn. Ct. App. Apr. 26, 2004); *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521, at *2 (Tenn. Ct. App. Nov. 25, 2003)).

Regarding the best interest analysis, Mother claims that she has provided excellent medical care for the children, while Father is allegedly "in denial" about the children's medical conditions and more concerned with the children gaining independence. From our careful review of the sizeable record in this case, we find nothing to indicate that Father does not attend to the children's medical needs or appreciate their severity. The trial court specifically found that "Father and Stepmother provide the children with a healthy environment . . . ." Father testified that he managed Brandon's cystic fibrosis according to what his doctors recommended, and it is not necessary to recount the lengthy testimony from Father and Angela regarding their specific methods of attending to the children's medical conditions. Father testified that he and Angela "provide a healthy environment for [Brandon]; we provide an environment where his mind is going to grow as well as his lungs. This child is not going to be defined by cystic fibrosis." The children's pediatrician stated that both children were "well cared for medically." He described Mother as very attentive to the children's medical care, and Father as a concerned parent. It is clear from the parties' testimony that Mother, Father, and Angela all travel to Brandon's medical appointments at Vanderbilt. We cannot say that Mother or Father is comparatively more fit to provide for the children's medical care, and we commend both parties for their efforts.

Next, Mother claims that the trial court erred in weighing the evidence regarding her responsibility for the children's problems at school. She claims there was no evidence to prove that she took Carter to school late twenty-one times. She also argues that it was an "abuse of discretion" for the trial court to discount her testimony that Carter's private school, USJ, "goes out of the way to assign him extra work, keep him out of play time, suspend his extra activities," and so forth. She cites the opinion of the children's psychologist that "a less accelerated school environment may well be more appropriate for Carter at the present time." We recognize that much conflicting testimony was presented before the trial court regarding Carter's academic struggles. Carter's teacher testified that she gave Carter unlimited extra time to complete his assignments, but she asked Mother to bring

Carter to school early so that he could do some work there and prepare for the school day. Ms. Gayton discussed the problems Carter encountered when he was repeatedly late to school. She testified that she could say "pretty definitively" that Father was never responsible for bringing Carter to school late. Father also testified that he did not take the children to school late, and they actually arrived at school by 7:30. Mother denied that she was responsible for Carter being tardy, blaming the "carpool system" and accusing Carter of spending too much time at his locker. Mother also pointed to the fact that Brandon was never reported tardy, but Father testified that because Brandon was in pre-kindergarten, his teachers did not count tardies.

The trial court found that Mother had been late twenty-one times bringing the children to school in the past year, while Father had never been late bringing the children to school. The court also found that "Mother is not supportive of the children's education" and "she tended to view what seemed to be normal, typical academic expectations as overly harsh." On the other hand, the court described Father as "deeply involved in the schooling of both the boys" and stated that Father would "encourage the children's success" and provide "a structured environment as well as academic support for the kids." A trial court is, of course, in the best position to observe the demeanor of the witnesses and to assess their credibility. *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005). "Consequently, we are loathe to second-guess the trial court's determination of credibility." *Id.* With due deference to the trial court's determinations of credibility, we cannot say the evidence preponderates against a finding that Father is better suited to provide the children with an education.

The court also found, relevant to the best interest analysis, that Mother had become overwhelmed by the birth of her third child. Mother was raising an infant and two children with special needs by herself. Mother did not receive any type of financial or other support from Ashley's father, and Mother was unemployed. Father had remarried and had a stable home environment. Considering all these factors, the record supports the trial court's conclusion that a change in custody was in the best interest of the children.

## B. Dr. Leite

On appeal, Mother argues that the trial court erred "when it did not exclude the continued involvement of the court appointed psychologist in this matter." At the beginning of Dr. Leite's testimony, counsel for Father asked him to describe their past relationship.[2] Dr. Leite testified that in 1992, Father's counsel handled his personal divorce, and since then they had developed a friendship and consulted on cases. On cross-examination, Mother's attorney asked if it would be fair to say that Dr. Leite was "good friends" with Father's attorney, to which Dr. Leite responded, "Yes." However, after that response, Mother's attorney's moved on and continued to examine Dr. Leite

---

[2] As previously discussed, during the original divorce proceedings, Father moved for Mother to be evaluated by one of five psychologists listed in his motion, "as chosen by counsel for [Mother]." The trial court entered an order providing that Mother would be evaluated by Dr. Leite, who was one of the five psychologists listed. However, the evaluation was not performed because the parties reached an agreement on a parenting plan. During the modification proceedings, a consent order was entered providing that both parties would be evaluated by Dr. Leite.

without objection as to his impartiality. It appears that Mother assigns error to the fact that the trial judge did not exclude Dr. Leite from participating in the trial *sua sponte* when Dr. Leite testified about his friendship with Father's counsel. Mother states in her brief that she "filed a timely motion to appoint a new psychologist." However, the only motion Mother filed in this regard was approximately four months before trial when she simply claimed that Dr. Leite was "too busy" to evaluate her.[3] Mother also lists several facts in her brief which allegedly imply bias or prejudice on the part of Dr. Leite; however, after reviewing these facts, we find no support for Mother's assertion.

Rule 35.01 of the Tennessee Rules of Civil Procedure provides, in pertinent part:

> When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in custody or legal control.

The Middle Section of this Court has interpreted Rule 35.01 "to provide the defendant the right to have a plaintiff examined by a physician selected by the defendant unless the plaintiff can show a good reason why the court should not honor the defendant's choice." *Newton v. Ceasar*, No. M2000-01117-COA-R10-CV, 2000 WL 863447, at *2 (Tenn. Ct. App. Jun. 29, 2000). The Court noted that in other jurisdictions, objections to the defendant's choice of doctors have been upheld on the grounds of bias, inconvenience, and the fact that the examination would cause harm or pain. *Id.* "A doctor chosen by the defendant to examine the plaintiff is not objectionable, however, solely because of a personality conflict between plaintiff's counsel and the doctor, nor on a bare allegation of bias or prejudice." *Id.* (citations omitted). In this case, Mother did not raise a valid objection to the doctor chosen by Father.

We note that Dr. Leite testified unequivocally that Mother's test data did not suggest the presence of Munchausen's syndrome by proxy or sociopathy, as Father had alleged, and Mother's brief cites Dr. Leite's testimony extensively in this regard. Mother clearly disagrees with some of Dr. Leite's other conclusions, and at trial, she presented the testimony of Dr. Ciocca, who also criticized some of Dr. Leite's statements. However, weighing the credibility of the experts and resolving legitimate but competing expert opinions were matters entrusted to the trier of fact. *Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 275 (Tenn. 2005). In short, we find no error by the trial court regarding Dr. Leite's involvement in the case.

---

[3] Dr. Leite stated in his report that Mother was late for her first appointment, requiring a second appointment which did not occur for several months "due to the birth of her baby and varied legal concerns." He also testified that she repeatedly cancelled appointments.

### C.    Contempt

Mother contends that the trial court erred "when it ruled that the noncompliance by [Father] was not significant, did not rise to the level of willful contempt, and therefore was not punishable." On appeal, we review a trial court's decision of whether to impose contempt sanctions using the more relaxed abuse of discretion standard of review. *Moody v. Hutchison*, 159 S.W.3d 15, 25 (Tenn. Ct. App. 2004) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn. 1993)). "Determinations regarding contempt lie within the trial court's sound discretion and are final, absent any plain abuse of that discretion." *Hill v. Hill*, 152 S.W.3d 543, 548-49 (Tenn. Ct. App. 2004) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn. 1993); *Sherrod v. Wix*, 849 S.W.2d 780, 786 (Tenn. Ct. App. 1992)). Given Father's testimony regarding his attempts to comply with the various court orders, we find no abuse of discretion in the trial court's determination that contempt sanctions were not necessary at this time.

### D.    Attorney's fees on Appeal

Both Father and Mother have requested attorney's fees on appeal. "The decision of whether to award attorney's fees on appeal rests solely within the discretion of this Court." *Parchman v. Parchman*, No. W2003-01204-COA-R3-CV, 2004 WL 2609198, at *6 (Tenn. Ct. App. Nov. 17, 2004) (citing Tenn. Code Ann. § 36-5-103(c) (2003)). We should consider "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered." *Id.* (citing *Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 Tenn. App. LEXIS 628, at *26-27 (Tenn. Ct. App. Sept. 3, 2003)). Given the issues involved in this case and the parties' financial positions, each party should pay their own attorney's fees.

### V.    CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Further, we decline to award attorney's fees to either party. Costs of this appeal are taxed to the appellant, Nina Louise James Bumpus, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.