IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 12, 2010 Session

## IN RE: SKYLER J. H.

**Appeal from the Juvenile Court for Davidson County**
**No. 2004-004-006      Betty K. Adams Green, Judge**

**No. M2009-01991-COA-R3-JV - Filed February 28, 2011**

The father of a young child born out of wedlock petitioned the juvenile court to be awarded custody of the child. The mother responded by asking the court to award custody to her. After many delays, the juvenile court referee conducted a lengthy hearing and granted the father's petition, holding that although it was a close question, it was in the child's best interest for the father to exercise custody. The mother appealed to the Juvenile Court Judge, who reached the same conclusion after another hearing. The mother now appeals to this court, contending that custody should have been awarded to her for several reasons, including the operation of the tender years doctrine. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, joined.

Tusca R. S. Alexis, Nashville, Tennessee, for the appellant, Emabel N.

Edward L. Hiland, Nashville, Tennessee, for the appellee, Joseph Owen H.

**OPINION**

### I. A PETITION FOR CUSTODY

Emabel N. ("Mother") and Joseph Owen H. ("Father") were engaged to be married. Mother moved into Father's house, together with her four year old daughter from an earlier relationship, after she became pregnant with Skyler J.H., the child at the center of this appeal. Mother voluntarily moved out of Father's house just prior to Skyler's birth on July 1, 2004, for reasons that the parties sharply dispute. Mother called Father to come to the hospital when she went into labor, and Father was present at the birth of the child. After she was

discharged from the hospital, Mother moved back into Father's house.

Shortly after Skyler was born, Father took a DNA test because Mother allegedly told him that she did not think the child was his. The DNA test confirmed that Skyler is indeed Father's child. Father subsequently filed a voluntary acknowledgment of paternity, and his name appears on Skyler's birth certificate. Mother and Father took leave from their jobs after Skyler was born, and they shared parenting responsibilities.

After they returned to work, Father and Mother agreed to alternate care in accordance with their respective work schedules, and they also enrolled Skyler in daycare. When Mother was at work and Father was taking care of Skyler, he also took care of Mother's older child. Father's mother and Mother's parents also helped with Skyler's care. Mother moved out of Father's house on October 29, 2004.

On November 9, 2004, Father filed a petition in the Juvenile Court of Davidson County asking the court to award him custody of Skyler and to set child support. Father asserted that he was already caring for the child over 50% of the time, a claim that Mother disputed. Father also contended that Mother had a "mercurial temperament," and that because of her work schedule, transfers of custody were erratic and that they sometimes occurred in the middle of the night, regardless of his convenience or of the best interest of the child. The juvenile court referee granted Father a restraining order to prevent mother from interfering with his peaceful possession of the child "from Friday afternoon at 4:30 p.m. until Monday morning at 7:00 a.m. as well as daycare pickup the evening before [Mother] goes to work at 6:00 a.m. the following morning."

The parties entered into an Agreed Order on November 30, 2004. The Agreed Order set a temporary visitation schedule, based upon the parties' work schedules, pending a final hearing scheduled for February 17, 2005. Under the order, Mother was allowed to pick Skyler up from daycare after 2:30 p.m. on her workdays, but had to return him to Father's care by 7:30 p.m. if she was scheduled to work the following day. The order stated that "[t]he parties acknowledge that work schedules may change and the order is intended to reflect the 'scheduled' work days of the parties whenever they may fall."

The Agreed Order also recited that "the agreement stated herein shall not prejudice the Mother's right to a full hearing on the issues of visitation and this interim order shall have no binding effect upon the final determination." Other issues were reserved, pending the final hearing. Despite the flexibility that was intentionally written into the Agreed Order to take changes in work schedules into account, the parties found it difficult to reach agreement as to the proper division of parenting time, especially after Mother's schedule at her job with Corrections Corporation of America was changed to six days on and two days off. Thus,

although the parties managed to share parenting time, disagreements as to their respective rights remained a continuing irritant in their relationship.[1]

## II. Further Proceedings Before the Juvenile Court Referee

The parties have stated that the juvenile court referee initially conducted two days of hearings on Father's petition, but there is no documentation in the record as to their content or whether or not they began on the scheduled date. It appears, however, that the referee ordered the parties to try to resolve their differences through mediation before making a custody determination. The parties went to mediation, but on February 16, 2006, the mediator reported that mediation had been unsuccessful, "although it is my sincere belief that both parties are dedicated to the well being of Skyler."

Father was a police officer. In June of 2006, he was injured after helping a motorist when the stopped police car in which he was sitting was struck from behind by a speeding vehicle. Mother took time off from work to help take care of Father in the first few days following his discharge from the hospital. The Police Department placed Father on medical disability leave, and he remained on disability during the hearings in this case. Father's injuries limited some of his activities, but he contended that it did not affect his ability to care for his child. Father's disability status gave him more time to spend with Skyler, while Mother's full-time job continued to constrain her own hours with him.

On August 1, 2007, Mother filed a motion to change the temporary visitation schedule. The motion alleged that since the entry of the previous order, Mother's work schedule had changed, and that a material change of circumstances had occurred that made it in the child's best interest that visitation be changed pending the final hearing of the case. It appears that Mother's motion was never heard, because no order in regard to it can be found in the record.[2]

The juvenile court referee did not resume the hearing after mediation proved fruitless. The case was subsequently transferred to a different referee. Unfortunately, no court reporter was present during the earlier proceeding, and the former referee's notes could not be located. After discussion with the attorneys, the referee determined that a fresh start was

---

[1]Mother subsequently changed jobs several times and was ultimately able to obtain a more normal work schedule.

[2]Mother's motion refers in four places to May 4, 2004, as the date of the visitation order for which modification was requested. Since the child was not born until July 1, 2004, we assume that the attorney meant to refer to the Agreed Order which was entered on November 30, 2004, and filed on December 3, 2004.

needed, and he heard testimony on February 7, March 12, and April 10 of 2008.[3]

Mother and Father both acknowledged that the other parent loved Skyler and was a fit parent to the child. Their testimony as to the fitness of both parents was confirmed by other witnesses, including Father's mother and Mother's father. The proof also showed that both Skyler and his half-sister were doing well. While Mother and Father both praised their own efforts at child rearing and both acknowledged in a general way the fitness of the other party, each was highly critical of the other party when discussing the details of their child rearing activities.

For example, Father testified that he taught himself Spanish so he could teach Skyler his ABCs and his numbers in both languages (Mother is from Puerto Rico and she speaks Spanish at home). He further testified that on a typical day, he fixes a hot breakfast for the child and that they then watch educational cartoons together, like Dora the Explorer and Blues Clues. Afterwards, they talk, and Father teaches Skyler how to write his numbers and letters with a crayon, and helps him to do little crafts projects, like building a birdhouse or making game boards. Father also testified that other children sometimes come over to his house to play with Skyler. Mother criticized Father, however, for not enrolling Skyler in pre-school, and she suggested that the child was developmentally delayed as a result. She further implied that rather than being actively engaged with Skyler, Father was simply sitting him down in front of the television set for long periods.

Mother introduced photographs into the record of herself and her children enjoying themselves at home, at Chuck E. Cheese, at the zoo, and on the beach. She acknowledged under questioning that the beach pictures were taken in Puerto Rico, during a week long trip she and the children took to visit family in December of 2006, with Father's agreement. Mother also testified that her older child was a straight A student at Lighthouse Christian Academy, and that she made the Principal's List every semester.

The parties had similar complaints about some specific aspects of the other's parenting. They also disputed the facts of various incidents between them.

At the conclusion of testimony and closing arguments, the referee announced his decision from the bench. The referee noted that the Father and Mother did not get along and that many of their complaints arose from their animosity towards each other, but had very little do with the best interest of the child. The referee then discussed in turn each of the

---

[3]Although the date of the first hearing before the juvenile court referee is not in the record, the remarks of the attorneys when the hearing reconvened indicates that there were a number of subsequent continuances and that a great deal of time passed in the interim.

factors that the courts are directed to consider under Tenn. Code Ann. § 36-6-106(a) when making custody or parenting decisions. The referee found that the parties are "virtually equal with regard to the statutory factors," but that since Father had been Skylar's primary caregiver since his birth, the factor of continuity of care made it in the child's best interest that primary residential care be placed with him.

The referee's decision was memorialized in an order entered on May 13, 2008. Mother was ordered to pay child support of $429 per month directly to Father, in accordance with an attached income shares worksheet. A fairly standard parenting plan was also adopted, with Mother permitted to have parenting time with Skylar every other weekend, and overnight visitation on Wednesday night every week, with holidays to be divided equally between the parents.

### III. PROCEEDINGS BEFORE THE JUVENILE COURT JUDGE

After the referee's order was entered, Mother filed a timely request for a rehearing on all issues before the Juvenile Court Judge. *See* Tenn. Code Ann. § 37-1-107. The Juvenile Court Judge agreed, and the hearing was conducted on April 3 and 6, 2009, with a virtually identical lineup of witnesses taking the stand as had testified before the referee. Their testimony included the same matters that had been presented earlier, but it also touched on events subsequent to the hearing before the juvenile court referee.

Father testified that Mother was three months behind with child support. Mother claimed that she had made every required support payment, but she was unable to supply documentation as to the allegedly missing payments. She claimed that the checks for those particular payments were drawn on an account at a different bank from the one she used for her other payments, and that she had a problem getting check copies. Father also testified that Mother insisted that Skyler be enrolled in preschool at Lighthouse Christian Academy where Mother's older child was enrolled, and that she promised to help with the costs. Father did enroll Skyler as requested, and he paid the child's fees. Mother was asked about the promised assistance:

Q. And have you helped pay for it?

A. I'm paying child support.

Father also testified that Mother was almost always late bringing Skyler to his house in the mornings when his parenting time was scheduled, and that she was also late when bringing him to preschool when that was her responsibility. Evidence was also presented that when Mother brought her daughter to school, she was often late. Mother contended that her

work schedule sometimes made it difficult for her to be punctual, and that her daughter's tardiness was due to her asthma.

Father also complained that on the mornings when Mother brings Skyler over to his house before going to work, the child is not ready for preschool. He claimed that the child's hair was often uncombed, his teeth were not brushed, and that he was dressed in clothing that was too small for him or was inappropriate for school. Father entered photographs he took on some of those mornings to demonstrate his contentions.

The proof indicated, nonetheless, that Skyler was a well-adjusted child. Father testified that the child loves interacting with other children at Lighthouse Christian and elsewhere, and that he also loves going to church and to Sunday School. Skyler also enjoys playing soccer (Father coaches the team). It is clear that Skyler benefits from his relationships with both parents, as well as with their families, especially Mother's large extended family. Mother's father testified that prior to the referee's order, he enjoyed almost daily contact with Skyler, and that the child greatly enjoyed being with him and with his other grandchildren. Since then, however, to the grandfather's sorrow, contact between them has become infrequent.

At the conclusion of testimony and closing arguments, the court took the case under advisement, pending Mother's submission of copies of the missing child support checks in the following week. However, the court stated that the parents were fighting over relatively trivial matters, and she admonished both parties to do more to foster a positive relationship between the child and the other parent.

The court's final order was entered on August 11, 2009.[4] The court stated that it found that "both Parties, in spite of their animosity toward one another, are fit and proper persons to care for the minor child," and it awarded them joint custody of the child, but with Father to exercise primary parenting responsibilities. It also found that the present parenting schedule was in the best interest of the child and should be continued, but "with certain minor changes."[5]

---

[4]The order does not mention the missing child support checks.

[5]The changes referred to include giving Mother parenting time with the child during Spring break, dividing parenting time equally during summer vacation, and allowing Mother to take the child to school on Wednesday mornings and on Monday mornings after her weekend visitation time, rather than taking the child to Father's house first.

The court stated that its determination "is based upon the comparative fitness of the parties and the need for stability of the child." The court also cautioned Mother that "the court will be mindful of the child's attendance and tardy record at school with regard to the Mother's time management," and it ordered that "Father shall seek to use the Mother or her parents as caretakers for the minor child during any periods of time he goes out of town without the child." This appeal followed.

## IV. ANALYSIS

### A. The Standard of Review in Custody Cases

Our review of findings of fact in cases of child custody or parenting plans is *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *In re C.K.G.*, 173 S.W.3d 714, 732 (Tenn. 2005); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). Questions of law in civil cases are reviewed *de novo* with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston,* 854 S.W.3d 87, 91 (Tenn. 1993).

We are mindful that "[t]rial courts are vested with wide discretion in matters of child custody" and that "the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). Also, because "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves," appellate courts "are reluctant to second-guess a trial court's decisions." *Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1997); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997); *Gaskill v. Gaskill,* 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996).

The paramount consideration in a custody case is always the welfare and best interest of the parties' minor children. Tenn. Code Ann. § 36-6-106(a); *Lentz v. Lentz,* 717 S.W.2d 876, 877 (Tenn. 1986)*; Ruyle v. Ruyle*, 928 S.W.2d 439, 441 (Tenn. Ct. App. 1996); *Koch*, 874 S.W.2d at 575. Comparative fitness is the standard that our courts normally apply when determining whether it is in the best interest of a child to place him or her in the primary custody of one legal parent or the other. *Parker v. Parker*, 986 S.W.2d 557, 562 (Tenn. 1999); *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983).

"Fitness for custodial responsibilities is largely a comparative matter. No human

being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others." *Bah*, 668 S.W.2d at 665-66 (citing *Edwards v. Edwards,* 501 S.W.2d 283, 290-91 (Tenn. Ct. App. 1973)). Thus, the court's decision in this case did not amount to a judgment that Mother is unfit in any way to parent Skyler, but rather that in consideration of all the factors that go into a custody decision, Father retained a slight edge.

## B. The Question of Best Interest

To help our courts determine the best interest of a child in a custody proceeding, the General Assembly has set out a non-exclusive list of factors that courts are directed to consider when making such a determination. These include:

(1) The love, affection and emotional ties existing between the parents and child;
(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . .
(4) The stability of the family unit of the parents;
(5) The mental and physical health of the parents;
(6) The home, school and community record of the child;
(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;
(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . .
(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and
(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a).[6]

While the trial court is obligated to consider all the relevant factors in reaching its decision, it is not required to list in its opinions or orders each of those factors, nor is it required to explain how each factor affected its overall determination. *Woods v. Woods*, M2006-01000-COA-R3 -CV, 2007 WL 2198110, at *2 (Tenn. Ct. App. Jul. 26, 2007) (no Tenn. R. App. P. 11 application filed); *Matlock v. Matlock,* M2004-01379-COA-R3-CV, 2007 WL 1452691, at *5 (Tenn. Ct. App. May 16, 2007) (no Tenn. R. App. P. 11 application filed).

Our courts have observed several times, however, that it would be helpful for the trial court to explicitly set out its factual findings in as much detail as possible so that we may review those findings under the standard of Tenn. R. Civ. P. 13(d), which accords a presumption of correctness to findings of fact unless the evidence preponderates otherwise. Where the trial court fails to make specific factual findings, there are no findings to which the presumption can attach, and we must conduct our own independent review of the record to determine where the preponderance of the evidence lies. *Curtis v. Hill*, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006).

In this case, the Juvenile Court did not specifically refer to the statutory factors, but simply stated that its decision was "based upon the comparative fitness of the parties and the need for stability of the child." After a careful examination of the evidence in this case in light of all the relevant factors, we find ourselves in agreement with the juvenile court referee and Judge that the parties are close to equal with regard to the statutory factors.

---

[6]In 2005, our legislature enacted a statute that requires the creation of a permanent parenting plan, which must be incorporated into "any final decree or decree of modification in an action for absolute divorce, legal separation, annulment, or separate maintenance involving a minor child." Tenn. Code Ann. § 36-6-404. Such a parenting plan must include the creation of a "residential schedule," and the designation of a "primary residential parent," meaning "the parent with whom the child resides more than fifty percent (50%) of the time." Tenn. Code Ann. § 36-4-402(4). The legislature also set out a list of factors for the courts to consider in determining which parent should be designated as the primary residential parent.

As a practical matter, the designation of a "primary residential parent" is functionally equivalent to an award of custody, and the factors set out in Tenn. Code Ann. § 36-4-404(9)(b) are similar, but not quite identical to, the factors set out in Tenn. Code Ann. § 36-6-106(a). Although the trial court in this case incorporated a parenting plan into its final order, that order, by its terms, included an award of "joint custody" to both parents. Also, the parties in the present case never married, so there was no divorce or legal separation, and the provisions of Tenn. Code Ann. § 36-4-404 were never triggered. We will accordingly apply the factors set out in Tenn. Code Ann. § 36-6-106(a) in our analysis.

In light of the conflicting testimony between the parties as to some of the statutory factors, it appears to us that the decision of the Juvenile Court Judge was at least in part based upon its assessment of their relative credibility. As we noted above, the trial court had the opportunity to directly observe the demeanor of the parties and of the witnesses on the stand, and since we do not have that advantage, we are reluctant to second guess its decision.

We further note that the evidence indicated that Mother found it difficult to balance the demands of earning a living and dealing with the needs of her two young children, with results that were potentially detrimental to the child. For example, she allowed Skyler's medical insurance to lapse, even though it would have cost her nothing to include him in her coverage. In addition, she urged Father to enroll Skyler in preschool, and promised to help with tuition, but after he was enrolled, she did not keep her promise.

Mother was also frequently unable to have Skyler suitably groomed, fed, and dressed for school. She had a serious problem with punctuality at work and at her children's school, so much so that the court stated in its final order that it "will be mindful of the child's attendance and tardy record at school with regard to the Mother's time management." We are sympathetic with the plight of the single parent, but the best interest of the child must be our paramount consideration in custody matters. *See* Tenn. Code Ann. § 36-6-106(a); *Bah*, 668 S.W.2d at 665. In sum, the evidence did not preponderate against the trial court's findings on the relative fitness of the parties, and we therefore conclude the court did not abuse its discretion in ruling as it did.

### C. Continuity of Care

Mother has raised two specific arguments on appeal, which we will address in turn. First, she contends that the trial court unfairly violated the promise contained in the Agreed Order of November 30, 2004, that "the agreement stated herein shall not prejudice the Mother's right to a full hearing on the issues of visitation and this interim order shall have no binding effect upon the final determination." Her argument is that by relying on continuity of care as its main basis for awarding custody of Skyler, the trial court gave binding effect to the unequal division of parenting time set out in the Agreed Order.

Mother does not deny that she received a full hearing. Unfortunately, the hearing did not occur until long after the time anticipated. The Agreed Order stated that the final hearing was scheduled for February 17, 2005. For reasons that are unclear from the record, the hearing that led to the first custody determination in this case did not even begin until February 7, 2008, almost three years after the temporary visitation plan was adopted, and the

hearing before the Juvenile Court Judge did not begin until April 3, 2009.

Mother argues that the delay was due to nine consecutive continuances, which she implies were engineered by Father to thwart the exercise of her parental rights. Father acknowledges that there were continuances in this case, but he asserts that some of them were requested by Mother, and he denies that any such scheme was contemplated. Unfortunately, none of the orders granting continuances have been made a part of the appellate record. In any case, it appears to us that the parties have been operating under the temporary visitation schedule for so long that it has become unreasonable to exclude the factor of continuity of care from the trial court's deliberations.

The parties do not dispute that under the temporary plan, Father exercised more parenting time with Skyler than Mother did. Also, Father remained in the same home during the entire course of these proceedings, while Mother changed residences five times. Because children are more likely to thrive in a stable environment, the courts favor maintaining existing custody arrangements. *Taylor v. Taylor*, 849 S.W.2d 319, 332 (Tenn. 1993); *Kellett v. Stuart*, 206 S.W.3d 8, 14 (Tenn. Ct. App. 2006); *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999). The proof showed that Skyler has flourished under the existing arrangement, and thus the factor of continuity clearly favors Father. The Agreed Order may not trump the trial court's obligation to make a decision that is in the best interest of the child.

The juvenile court referee stated in its order that Father had been Skyler's primary caregiver since his birth, and that continuity of care made it in the child's best interest that primary residential care be placed with him. However, the Juvenile Court Judge referred both to "the need for stability of the child" and to "the comparative fitness of the parties" in explaining its decision to award primary parenting responsibility to Father. Thus the court's decision was not based solely on continuity of care, and Mother's argument is without merit.

### D.  The Tender Years Doctrine

Mother also contends that the trial court erred by not giving her the benefit of the tender years doctrine, which presumes that a young child should remain in the custody of its mother. "A mother, except in extraordinary circumstances, should be with her child of tender years. The courts have repeatedly recognized this as a primary doctrine. Normally, such a child will not be taken away from its mother unless it is demonstrated that to leave the child with its mother would jeopardize its welfare, both in a physical and in a moral sense." *Weaver v. Weaver*, 261 S.W.2d 145, 148 (Tenn. Ct. App. 1953).

In *Bah v. Bah*, however, this court questioned the continuing relevance of the tender

years doctrine in light of societal changes in the role of women:

> To the extent the "tender years" doctrine has continued efficacy it is simply one of many factors to be considered in determining custody, not an unyielding rule of law. The only rigid principle is and must be that the best interests of the child are paramount in any custody determination. Times have changed. Many mothers now work, either by necessity or choice, and no longer assume the primary nurturing role for small children. We believe the "presumption of tender years" espoused in *Weaver* is no substitute for an individualized investigation involving custody in every case. Such factors as the warmth, consistency, and continuity of the relationship between parent and child and not the sex of the parent actually govern a child's best interest. These things can be provided by the father as well as the mother.

668 S.W.2d at 666. *See also Varley v. Varley*, 934 S.W.2d 659, 666 (Tenn. Ct. App. 2006); *Ruyle*, 928 S.W. 2d at 442; *Shelby v. Shelby,* 696 S.W.2d 360, 361 (Tenn. Ct. App. 1985).

In 1987, perhaps in reaction to this court's decision in *Bah v. Bah*, our legislature added a section to the child custody statute, Tenn. Code Ann. § 36-6-101(d), which prohibited consideration of gender in custody decisions, but made a specific exception when children of tender years were involved [Acts 1987, ch. 266, § 1]. In 1997, the legislature removed the tender years exception from that section [Acts 1997, ch. 208, § 1]. Tenn. Code Ann. § 36-6-101(d) now reads in its entirety, "[i]t is the legislative intent that the gender of the party seeking custody shall not give rise to a presumption of parental fitness or cause a presumption or constitute a factor in favor or against the award of custody to such party."

Since the tender years doctrine is no longer a viable rule of law, we can find no fault in the trial court's conclusion, after its "individualized investigation" in this case, that it was in the best interest of Skyler to remain in Father's custody.

## V. CONCLUSION

The judgment of the trial court is affirmed. We remand this case to the Juvenile Court of Davidson County for any further proceedings necessary. The costs on appeal are taxed to the appellant, Emabel N.

_____
PATRICIA J. COTTRELL, JUDGE